## DOTSON WALKER v. STATE.

No. A-2255.   Opinion Filed December 11, 1915.

(153 Pac. 209.)

1. **WITNESSES — Discretionary Ruling — Competency of Witness.** When objection is made to a witness, on the ground of incompetency by reason of nonage, the competency of the witness is a mixed question of law and fact to be determined by the trial court upon an examination of the witness, and only a manifest abuse of judicial discretion in deciding that a child is competent to testify, will warrant interference with such decision on appeal.

2. **WITNESS—Competency of Child.** There is no precise age fixed at which children are excluded from giving evidence. Under the statute (section 5050, Rev. Laws), intelligence and not age is the proper test by which the competency of a child as a witness must be determined, and where it appears that a child witness had sufficient intelligence to receive just impressions of the facts respecting which she is to testify, and the capacity to relate them truly, and has received sufficient instruction to appreciate the difference between right and wrong, and a proper consciousness of the punishment of false swearing, an objection on the ground of incapacity and incompetency was properly overruled.

3. **RAPE—Physical Examination—Discretion.** In a prosecution for rape the prosecutrix being a child seven years old, the defendant demanded that the court order a physical examination of the prosecutrix by a competent physician, which demand was denied by the court. Held, that under the peculiar circumstances of the case it was a manifest abuse of discretion on the part of the trial court to refuse to make the order.

4. **RAPE—Ground for Reversal—Evidence.** Any legal evidence from which the jury may legitimately adduce guilt or innocence is admissible, if when taken with other evidence in the case its relevancy appears, and the rejection in a criminal case of proper testimony offered by the defendant constitutes prejudicial error.

*Appeal from District Court, Wagoner County;*
*R. C. Allen, Judge.*

Dotson Walker, was convicted of rape and appeals. Reversed.

An indictment, charging plaintiff in error with the crime of rape upon one Bessie Burgess, was presented in the District

Court of Wagoner county, August 15, 1913. The crime of rape in the first degree is therein charged to have been committed by the defendant on the 15th day of September, 1911.

A statement of the case and the material testimony is as follows:

"Q. How old are you, Bessie? A. Nine.

"Q. Where do you live, Bessie? A. With Mr. Cole.

"Q. Where were you brought from yesterday? A. Brought from home?

"Q. The orphans home? A. Yes, sir.

"Q. At Pryor? A. Yes, sir.

"Q. Bessie, when you came in here awhile ago and held up your hand did you know what was meant when he asked you, told you that he was swearing you, did you know that he was swearing you to tell the truth? A. Yes.

"Q. Sis, now, don't be scared, just answer the question. Did you ever go to Sunday school? A. Yes, sir.

"Q. You have gone to Sunday school, what do they teach you there at Sunday school? About who?

"Objection overruled.

"Q. Who do they teach you about? A. About God.

"Q. And do they teach you about where you would go if you are a bad girl and tell stories? A. Yes, sir.

"Q. What would become of you if you would tell a story here and be a bad girl, where would you go when you died? A. Go to the Boogerman.

"Q. If you are a good girl and always tell the truth and be a good little girl, then when you die where will you go? A. Go to God.

"Mr. Robertson: I think she is qualified.

"Mr. Reed: The defendant objects. Objection overruled.

"EXAMINATION BY COUNSEL FOR DEFENDANT.

"Mr. Reed:

"Q. Bessie, did you know the meaning of an oath when you held up your hand and swore to tell the truth, do you know the meaning of that oath, do you know what it means? A. No, sir.

"Q. Do you have any idea what it means, Bessie? A. No, sir.

"RE-DIRECT EXAMINATION.

"Mr. Dickey:

"Q. You know that you should tell the truth, don't you, when you hold up your hand? A. Yes, sir.

"Mr. Reed: We object as being incompetent evidence.

"The Court: I think she has qualified.

"Q. Now, Bessie, do you know Dotson Walker? A. Yes, sir.

"Q. How long have you known him? A. A long time.

"Q. Did you ever live at his house? A. Yes, sir.

"Q. What did you call him when you lived there with him, what did you call Dotson Walker when you lived there; by what name? A. Daddy.

"Q. Now, Bessie, do you remember any time that Dotson Walker ever did anything bad with you?
"Objection made and overruled.

"Q. Do you know when he did bad things with you? Just answer the question, you don't want to be scared, you just want to answer those questions and tell the truth. Do you remember when Dotson Walker did bad things with you?

"Same objection overruled.

"Q. Just answer that now? A. Yes, sir.

"Q. Now tell us what he did? Where was that Bessie that he did these bad things with you?

"Objection overruled.

"Q. Where was that Bessie? A. In the crib.

"Q. In the crib there where he lived at his house? A. Yes, sir.

"Q. Now when he did these bad things with you what would he do, just tell the jury now what did he do when he would take you down there to the crib, you just go on ahead and tell the jury what he would do when he would take you down there to the crib.

"The Court: Don't be afraid, just talk to the jury there and tell them what he would do.

"Q. What would he do? A. Get on top of me.

"Q. Would he make you pull your clothes up? Just answer that. A. Yes, sir.

"Q. He would and then after he would make you pull up your clothes what would he do, what would he do after he would make you pull up your clothes?

"The Court: Just talk right out like you were at home.

"A. He would get on top of me.

"Q. He would get on top of you, would he unbutton his pants? A. Yes, sir.

"Q. And then what would he do after he got on top of you?
"The Court: Just answer it, what would he do then, just tell the man what he would do.

"Q. You just talk right out now, don't be afraid, all of these people here are your friends and they just want you to tell the truth, just tell what would he do after he would pull up your dress and after he would unbutton his pants, he would get on you then would he?

"Objection overruled and exception taken.

"Q. And then would he put anything in you? A. Yes, sir.

"Q. Did that thing that he put in you go in you Honey? A. Yes, sir."

It is agreed that the defendant objects to every question and has his exceptions so as not to interfere with the witness here.

"Q. When he put that in you and when he took that thing out of his pants did he put it in you? A. Yes, sir.

"Q. Did it go clear in you? Did he make you bleed? A. Yes, sir.

"Q. Do you remember one day when you were down there in the crib? A. Yes, sir.

"Q. And you were laying there and he was on top of you and you cried out to him not to do it? A. Yes, sir.

"Q. Why did you do that Bessie, was it because he was hurting you? A. Yes, sir.

"Q. When you cried out to him that way and told him not to do that, was that thing in you then? A. Yes, sir.

"Q. You could feel it in there? A. Yes, sir.

"Q. And then when you got up you were bleeding?

"The Court: I think the objection ought to be sustained to that, it is a little leading. The last three answers are stricken.

"Q. When he was on top of you Honey what was he doing? Just tell these men what he was doing? A. I don't know.

"Q. You don't know, was he hurting you? A. Yes, sir.

"Q. And when you got through how were you then, did you look at yourself? A. Yes, sir.

"Q. What did you see, did you see anything on yourself? A. Yes, sir.

"Q. What was it Honey? A. Blood.

"Q. What did you tell him? A. I told him to quit.

"Q. Did you tell him anything else? A. No, sir.

"Q. Did you hollar out, were you crying? A. Yes, sir.

"CROSS EXAMINATION.

"Mr. Reed:

"Q. Who told you to tell this story—tell this jury who told you to tell this story, tell it. A. This man right there.

"Q. This man right here? Do you know Bill Brady? A. Yes, sir.

"Q. You know Uncle Bill don't you? A. Yes, sir.

"Q. Did you know Uncle Ollie Walker? A. Yes, sir.

"Q. Did Uncle Ollie Walker tell you to tell this story? A. Yes, sir.

"Q. Did Bill Brady tell you to tell this story? A. Yes, sir.

"Q. Did Ollie Walker tell you he would buy you some new shoes if you would tell this story? A. Yes, sir.

"Q. He did? A. Yes, sir.

"Q. Did Bill Brady tell you he would buy you a new dress if you would tell this story? A. Yes, sir.

"Re-Direct Examination.

"Mr. Dickey:

"Q. Everything you have told today is the truth, isn't it? A. Yes, sir.

"Q. And I never told you to tell anything, I just told you I wanted you to tell the truth, isn't that right? A. Yes, sir.

"Q. Then what you have told here is the truth? A. Yes, sir.

"Re-Cross Examination.

"Mr. Reed:

"Q. You know Ollie Walker and you know Bill Brady? A. Yes, sir.

"Q. Did you have a talk with either one or both of them Bessie when you came down here to testify before that body of men they called the Grand Jury up stairs, did you see them then? A. Yes, sir.

"Q. And you talked with both of them didn't you? A. When?

"Q. When you came down here from Pryor Creek to tell this story they told you to tell up stairs there to the Grand Jury to that body of men called the Grand Jury you talked to them then, didn't you? A. Yes, sir.

"Q. And they told you again that they would get you a new dress and a pair of shoes if you would tell the story on Daddy, didn't they? A. Yes, sir."

William Brady, the second witness for the state testified that he was a citizen of the Creek Tribe of Indians, and had known Dotson Walker for twenty years; that he lived about a mile from him, and that he knew Bessie Burgess since she was a little child. His further testimony was as follows:

"Q. Do you remember the occasion of riding by Mr. Walker's house in the fall of 1911 and hearing screams? A. Yes, sir.

"Q. How were you riding? A. I was riding along the road, and I heard some one hollaring, says: 'O, Daddy, you are killing me, Daddy you are hurting me.' And I got it located, it was right in the old house and I got off my pony and peeped through the crack and he was on top of her.

"Q. Who was? A. Mr. Walker.

"Q. All right, how was he dressed? A. Why I could not see on account of his overcoat.

"Q. What were their positions? A. Why it seems to me like that he was on top of her and there was about that much of her legs sticking out on that side.

"Q. I believe you stated that you peeped through the crack? A. Yes, sir.

"Q. Then what happened Mr. Brady? A. I then went back and got on my horse and rode up to the house, that was about a 120 steps, I suppose about that far, and got down and was sitting on the end of a log—and the little girl came along with a little corn in her arms and I says, 'What is the matter Bessie?' and she says, 'Daddy was doing it.'

"Q. What else did she say? A. I says, 'Did he hurt you?' She says, 'Yes, made me bleed.' I says, 'Now go on be a good girl and try and not go with him down there.' That is all I said.

"Q. What county and state was that in? A. Wagoner County, Oklahoma.

"Q. About what month was that Mr. Brady? A. I don't exactly know the date of the month but it was either in September or October.

"Q. Of what year? A. 1911.

"CROSS EXAMINATION.

"Mr. Reed:

"Q. You talked to this little girl about this since that date? A. No, sir, I didn't talk with her at all, I told her to go on and be a good little girl.

"Q. You didn't talk with her Uncle Bill when she came down here and went before the grand jury? A. No, sir, I never seen her.

"Q. If the little girl testifies that you told her you would buy her a new dress if she would tell this jury on her daddy she is mistaken ain't she, she is wrong about it, you didn't promise her anything? A. No, sir, I never even talked with her, I never seen her.

"Q. How does it come that you waited here two years after that time before you ever told anybody about this? A. Why, I didn't know exactly how to get at it but the next thing I was afraid of the lynching.

A Juror: Why didn't you interfere when you saw that man with this little girl under him down in that crib, why didn't you interfere right there and stop it? A. Why I don't know, I was afraid that I might get into trouble over it.

"The state rests.

"The defendant demurs to the evidence as not being sufficient to make a case.

The Court: Demurrer overruled.

"The Court: I think it is well to announce now Mr. Reed so that you will know how to meet the ruling of the court by the evidence in the case that it will be the holding of the court in this case, in view of the evidence that has been introduced, that the state is not confined to any particular day but that any day or date within three years prior to the date the Grand Jury returned this indictment fixes this offense.

"Mr. Reed: To which remarks of the Court and ruling of the Court and notice served on counsel for the defendant the defendant excepts."

Mrs. Sarah Walker called by the defendant testified as follows:

"Q. Are you Grandmother Walker? A. Yes, sir.

"Q. Is Dotson Walker, the defendant in this case, your son? A. Yes, sir.

"Q. Grandmother, tell this jury where you live? A. I live out here about five miles west of the river.

"Q. Do you know Bill Brady? A. Yes, sir.

"Q. How long have you known him? A. O, I expect I have known him twenty odd years.

"Q. You may tell the jury whether or not he has up until recently been a frequent visitor and friend of your family? A. He has.

"Q. You may tell the jury whether or not he is such at this time and if not why not? A. Well, he stayed around our house and I got tired of him staying there, I was not able to feed him, and it made him mad and he don't stay there now.

"Q. Do you remember where you were on the 15th day of September, 1911?

"Mr. Dickey: Objected to as incompetent, irrelevant and immaterial.

"The Court: Objection sustained.

"Mr. Reed: If the court please, now I don't want to be—

"The Court: I have passed on it, and I don't care to hear argument.

"Mr. Reed: The defendant excepts for the reason it is denying the defendant a constitutional right of a fair and impartial trial.

"The Court: I know what the law is on this subject.

"Mr. Reed: Does the Court hold that the evidence of the defendant in a transaction of this kind without proving any time

whatever or if having proved a different time from the time alleged in this indictment the State does not elect to take any specific time, that you could just generally vary from the indictment so that you could convict the defendant.

"The Court: The State has announced that it rested its case upon the incident occurring the day that Brady testified that he was at the house.

"Mr. Reed: That is the problem Your Honor what day?

"The Court: Now he has not fixed the day, the girl has not fixed the day, the Grand Jury didn't fix the day.

"Mr. Reed: I submit the indictment.

"The Court: The Grand Jury simply said it was on or about and that is the way all informations read and the law 'holds that you can prove it was any day within the statutory period. That is the holding of the Court and where this witness was on the 15th is incompetent, irrelevant and immaterial, to any issue in this case.

"Mr. Reed: I submit to the Court with all courtesy that it is the theory of the defendant at this time that if the court holds that we can't prove where this prosecutrix was on the day as alleged in the indictment that the defendant is being denied the right of a trial by jury.

"The Court: I do not want to hear any statements of that kind or argument of that character.

"Mr. Reed: I can't introduce evidence here in the behalf of the defendant then at all, I am forced to just quit in the case if the Court holds that is the law.

"Mr. Reed: We will excuse this witness as far as we are concerned then. I will ask that Bill Brady be recalled to ask him one question.

"Q. Are you the Bill Brady who testified in this case a moment ago? A. Yes, sir.

"Q. Uncle Bill did you have a conversation with Sarah Watkins about a year ago this time in which you told her that you had promised this little girl a new dress to tell this story against her father. A. A year ago?

"Q. Yes, just about this time a year ago? A. No, sir."

Sarah Watkins testified that about a year ago she lived out on Billy Creek on the same farm that Dotson Walker and his mother lived on and at that time Bill Brady told her that he had promised to get the little girl, Bessie Burgess, a new dress and clothes if she would tell the story that her father had criminal intercourse with her.

As a witness in his own behalf, the defendant Dotson Walker, testified that he had lived near Wagoner, in Wagoner county for about twenty-five years, and had known Bessie Burgess since she was about a week old; that he married her mother when Bessie was about two years old; that his wife, Bessie's mother died September 21, 1911; that at that time they were living with his mother Sarah Walker, and after her mother died Bessie remained with his mother. He denied all acts of improper conduct with the prosecutrix; that he supported his mother and his two children born of the marriage with Bessie's mother, a boy now about seven years old and a girl four years old. That Mr. Cole wanted Bessie and kept after him for her; that he told him that he could not do anything with her, and he said he would take her and try her a week and so he gave her to him; and then afterwards sent her off to the orphan's home.

The record shows that when the case was called for trial the defendant demanded a physical examination of the prosecutrix by a competent physician, which demand was denied by the court.

P. E. REED and E. L. BOLIN,
*For plaintiff in error.*

CHAS. WEST, Atty. Gen., and
SMITH C. MATSON, Asst. Atty. Gen.,
*For the State.*

DOYLE, P. J. This was an indictment presented in the District Court of Wagoner county, August 15, 1913, against Dotson Walker, plaintiff in error, for rape, alleged to have been committed on or about the 15th day of September, 1911, upon the person of Bessie Burgess, a female child under the age of

fourteen years. On a trial before a jury the defendant was found guilty of rape in the first degree as charged in the indictment and his term of imprisonment in the penitentiary was fixed at ten years. The court overruled a motion for a new trial and rendered judgment on the verdict, to reverse which the defendant appealed by filing in this court May 2, 1914, a petition in error with case-made.

Of the various errors complained of it is only necessary to note those based upon the rulings of the court on the admission and exclusion of evidence, and the sufficiency of the evidence to sustain the verdict.

The first question presented is, did the court err in holding the child Bessie Burgess competent as a witness?

Our statute provides:

"The following persons shall be incompetent to testify:

"First. Persons who are of unsound mind at the time of their production for examination.

"Second. Children under ten years of age who appear incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly."

Section 5050 Rev. Laws.

Under the statute when a witness is objected to, on the ground of incompetency by reason of nonage, or want of intelligence, it is the province of the trial court to determine the witness' competency, and its decision will not be reviewed unless there is a clear abuse of discretion, or the court admits or rejects the witness upon an erroneous view of a legal principle.

*Adams* v. *State,* 5th Okla. Cr. 347, 114 Pac. 347.

The examination of the witness, Bessie Burgess, shows that she was nine years old; that she knew when she held up her hand she was swearing to tell the truth; that she had attended Sunday school and had learned about God, and if she was a good girl and always tell the truth she would go to God; that if she would tell a story she would go to the Boogerman.

Counsel for the defendant then asked her if she knew, "the meaning of an oath." She answered, "No, sir." It is contended that this answer of the witness shows incapacity and incompetency, and therefore, "The court committed an abuse of discretion in permitting her to be sworn and to testify as a witness."

There is no precise age fixed at which children are excluded from giving evidence. Under the statute the competency of children is to be determined not by their age, but by the degree of understanding which they appear to possess. As a general rule the child should appear capable of distinguishing between good and evil and should be of sufficient intelligence to have a just appreciation of the difference between right and wrong, and a proper consciousness of the punishment of false swearing.

In this case no question seems to have been made as to the witness' capacity to receive just impressions respecting the facts upon which she was to be examined. While she stated that she did not understand the nature of an oath, as possibly many an adult might do if required to define the nature of the crime of perjury, we are satisfied that she understood the difference between right and wrong and the danger of false swearing, and that she was of sufficient intelligence to appreciate the conditions in which she was placed. Courts of justice should regard substance, not words, and a child that has an adequate sense of the impropriety of falsehood does understand the nature of an oath in the proper sense of the term, even though she may not know the meaning of the word oath, and may never have heard that word used.

*Williams* v. *United States,* 3 App. D. C. 335.

In this case it does not appear by the preliminary examination of the witness that she was incapable of receiving just impressions of the facts about which she was to testify or of relating them truly. For the reasons given we are of opinion that this witness was properly permitted to testify.

It appears from the record that when the case was called for trial the defendant demanded that a physical examination of the prosecutrix by a competent physician should be made. Which demand was denied by the court and exception allowed.

It will be seen from the statement of the testimony that the evidence adduced to establish the *corpus delicti* is of a very doubtful and inconclusive character; it consists exclusively of monosyllable answers by the child to leading and suggestive questions propounded by the county attorney and on her cross-examination she unhesitatingly states that her uncle Oliver Walker promised to buy her new shoes and her uncle Bill Brady promised to buy her a new dress if she would tell this story to the grand jury, and that before the trial they told her again they would get her a new dress and shoes if she would tell this story. In view of the unsatisfactory character of the testimony of the child witness and the fact that there is a direct conflict in her testimony, and that of the only other witness produced by the state, we think that the court erred in refusing the defendant's demand, that a physical examination of the child be made by a competent physician. While, "any sexual penetration however slight, is sufficient to complete the crime." Section 2416 Rev. Laws, there must be proof of some degree of entrance of the female organ, and the practice seems to be not to permit a conviction in those cases in which it is alleged violence was done, without medical proof of the fact, whenever such proof is attainable. If the private parts of the defendant entered those of the child, then only seven years of age, as the testimony of the state tends to show, the marks of penetration would be permanent and would be the best evidence of the actual commission of the crime charged.

It appears that when the state rested the court announced "that it will be the holding of the court in this case, in view of the evidence that has been introduced, that the state is not confined to any particular day but that any day or date within three years prior to the date the grand jury returned this indictment fixes this offense." And when the defendant's mother, the

first witness for the defense was called, the court upon the objection of the county attorney refused to permit the witness to testify where she was or where the prosecutrix was on the day alleged in the indictment on the ground that such testimony "is incompetent, irrelevant and immaterial to any issue in this case."

While the announcement of the court may be a correct general statement of law as applied to a variance between the time fixed in an indictment and that proven upon a trial, it was not a fair and explicit statement of the rule as it should have been applied to the facts in evidence in this case. The only testimony tending to show the time of the commission of the offense was that of the witness Brady, who stated that "it was either in September or October of the year 1911." The defendant was entitled to know the particular offense that he was called upon to defend against and to know approximately the time when it was committed, and we think that under the peculiar circumstances of this case, the uncalled for announcement of the court was prejudicial to the substantial rights of the defendant. We also think that the evidence rejected by the court was relevant, and competent as a preliminary inquiry, and that the remarks of the court excluding the same, could not have been otherwise than prejudicial to the defendant. A brief reference to a few facts of the case is all that is necessary to show the materiality of the evidence offered on the part of the defendant and rejected by the court. The evidence on the trial showed that the wife of the defendant, the mother of the prosecutrix died within a week from the date alleged in the indictment, and that the defendant's mother made her home with the defendant at the time the evidence for the state tends to show the alleged crime was committed.

The fact that no complaint was made until about two years after the alleged outrage, and that this delay is unexplained are circumstances which should be considered in connection with the utterly improbable statement of the despicable wretch who would have it inferred from his testimony that he witnessed the commission of a most revolting and atrocious crime committed upon a helpless child without protest on his part, or the manhood to

attempt to protect her or to at least make his presence known so as to prevent further abuse and outrage. A defendant in a criminal prosecution is entitled to a legal trial, conducted in accordance with the rules of law; and the question of his guilt or innocence should be determined upon legal evidence. Where material evidence has been offered on the part of the defendant, and erroneously rejected by the court, we are not at liberty to say that the error is merely technical, or that the substantial rights of the defendant have not been prejudiced. The defendant has the right to submit evidence of such character to the jury in order that it may pass upon its weight and credibility, and if he be deprived of that right, it is a substantial one, which, when properly presented to this court by exceptions reserved will require a reversal of his conviction.

Other questions are raised but we forbear from further discussion of this case. Enough has been said to indicate that we are of the opinion that the defendant did not have such a fair and impartial trial as he was entitled to under the law. If the unnatural and revolting crime charged has been committed, and if the defendant be guilty, it can be proven on another trial conducted more in accordance with the rules of law than the one under consideration.

The judgment of conviction is reversed and a new trial awarded.

FURMAN and ARMSTRONG, JJ., concur.