## FRANK HYDE v. STATE.

No. A-4177.   Opinion Filed Nov. 26, 1923.
Rehearing Denied Jan. 22, 1924.
(221 Pac. 787.)

(Syllabus.)

1. **Rape—Evidence Sustaining Conviction of Rape in First Degree.** In a prosecution for rape, evidence reviewed, and held sufficient to sustain conviction of rape in the first degree.

2. **Appeal and Error—Witnesses—Incompetency of Witness on Ground of Mental Unsoundness for Court—Discretion of Court.** Where objection is made to the competency of a witness to testify on the ground of mental unsoundness, it is the province of the trial court to determine the witness' competency, and its decision will not be disturbed unless a clear abuse of discretion is shown by the record.

3. **Witnesses—Incapacity to Testify not Implied from Incapacity to Give Legal Consent to Carnal Intercourse.** Incapacity to give legal consent to the commission of an act of carnal in-

tercourse does not necessarily imply incapacity to thereafter correctly and truthfully narrate the facts constituting the commission of the act.

4.      **Same.** The fact that the state accuses a defendant of rape in having accomplished an act of sexual intercourse with a female who was at the time of unsound mind and incapable of giving legal consent does not per se establish incompetency of such female to testify against the accused.

5.      **Trial—Competency of Witness for Court—Credibility for Jury.** In a prosecution for rape, where it is alleged the female was incapable through unsoundness of mind of giving legal consent, after the court has determined that the prosecutrix is competent to testify as a witness, the credibility of the witness immediately becomes a question to be determined by the jury.

Appeal from District Court, Jefferson County; Cham Jones, Judge.

Frank Hyde was convicted of rape in the first degree, and he appeals. Affirmed.

In the information in this case filed in the district court of Jefferson county on August 6, 1921, Frank Hyde was charged with the crime of rape in the first degree, in that he did in said county, on or about the 3d day of April, 1921, have sexual intercourse with a female, to wit, Floy Parker, then and there not his wife, and then and there being incapable through unsoundness of mind of giving legal consent. Upon his trial the jury found him guilty, and assessed his punishment at imprisonment in the penitentiary for a term of 15 years. From the judgment rendered on the 12th day of September, 1921, and a resulting sentence in accordance with the verdict to imprisonment in the penitentiary for a term of 15 years, he appealed by filing in this court on January 28, 1922, a petition in error with case-made.

The first witness for the state, Mary Parker, testified that she had lived in Waurika about 12 years, having moved

here from Coalgate; that at the date alleged defendant's home was about a mile from her home; that her daughter, Floy, is not bright, and her mental condition was caused by an attack of spinal meningitis when she was six years old; that during the past three years it was her daughter's habit to visit defendant's wife about once each month; that she usually walked, and defendant brought her home twice in a car, once in January, and again on April 3, 1921; that her daughter also visited Mrs. Hyde in May and June this year; that her daughter, Floy, is now pregnant; that, owing to her physical and mental condition, her daughter, Floy, had never attended school and was blind for one year; that her daughter was not able to remember facts and experiences as they happened, but could remember people that she had met; that her daughter was not in the habit of visiting any one except defendant's wife; that she will be 23 years old the 22d of this September.

The state called as its second witness the prosecutrix, Floy Parker, and after she was sworn counsel for the defendant requested to be allowed to inquire into her mental condition to determine whether she was a competent witness, which was allowed, and the jury excused

Examined by counsel for the defendant, Floy Parker testified:

"My name is Floy Parker. I live in the north part of town. There is a trial going on here now because my papa and mamma told me so; they are trying the case against Frank Hyde. I do not know what it means to take an oath, and I know nothing about the legal or moral obligation of an oath. My papa and mamma told me to tell the truth all the time. I never went to school. I do not know how to tell the time of day, nor the week, month, or year. I do not know what the commission of a crime means, and know nothing

about penalties fixed for crimes. I do know there is such a thing as a crime, and I do know that some things are criminal.''

Cross-examined by counsel for the state, she stated:

''I am 23 years old the 22d day of this month. I have lived here in Waurika about 15 years. We moved here from Coalgate. I have known Frank Hyde about 5 years. I used to go to his place about once a month. Frank Hyde's wife's name is Daisy. It has been about three months since I last visited there. If I tell a lie the bad man would get me. There is a good man; his name is God. I remember people I meet, and I am able to tell things that happen, and things I see. I know what I am called to testify about, and I will tell the truth.''

Dr. Maupin testified:

''I have been sitting in court during the examination of Floy Parker, and have observed her, and from this observation of her, and from her answers to questions propounded to her, I would say she was of unsound mind.''

Dr. Collins testified to the same state of facts, and that in his judgment she was of unsound mind.

Thereupon counsel for the defendant objected to Floy Parker testifying as being incompetent to testify by reason of her mental condition, which objection was overruled, exception allowed, and the jury recalled.

Against the defendant's objection the witness Floy Parker testified:

''My name is Floy Parker. I live in the north part of town, Rock Island addition to Waurika, with my mamma and papa. I have one sister; she is at home. I have no brothers. I will be 23 years old the 22d day of this month. Before coming to Waurika we lived at Coalgate. I have known Frank Hyde for about 4 years, and I know his father. His wife's name is Daisy Hyde. They live up by the Methodist Church.

I have been going over there to visit her about once a month, for 4 years. I usually go on Sunday, because she works in a laundry during the week. The last time I was there was in June. She was living then at Mr. Hyde's, the old man. I visited her before that in May, and I visited her on the 3d day of April, and Frank Hyde brought me home in the car. We got home about 6 o'clock. When I was leaving he said to Daisy, his wife, 'I am going to town, and will carry Floy on home as I go.' After we got into the car he said, 'Floy, I was going out to Dr. Derr's to look at a cow, and if you want to go it will be a nice ride'; so I said, 'All right.' After we got out there and looked at the cows we started home, and came to a log. We got out and talked a while. He told me to lay down, and he got on top of me, and put something in me. Of course I did not know what he was going to do. He took his pants down and took my clothes up, and put his privates into my privates. I did not know what he was doing. We got up and got in the car and started home. When we got home about sundown nobody but papa and mamma was there. Nobody ever touched me but Frank Hyde. I didn't want him to do it. I never did tell any one about it. It was the 4th day of July when I told mamma about it. The doctor was there that day, and made an examination. Mamma told me to tell the truth. I know what it is to swear the truth, and I am telling the truth. If I didn't tell the truth the bad man would get me."

On cross-examination she stated:

"I looked on the calendar. It was on the 3d day of April. I can sometimes tell the days and dates on the calendar, and my mamma told me it was on the 3d day of April that Frank Hyde brought me home. We left Frank Hyde's place between 5 and 6 o'clock. He said, 'We will rest a while, and let the engine cool.' We got out and sat down on the log and talked a long time. Then he made me lay down, and he got on top of me. We stayed down about 15 minutes. He told me not to say anything about it. It did not hurt me until I got home. Then it began to hurt me, and has hurt me ever since. As I said before, that man is the only man that ever

bothered me. There were two gates to open, and we went through both of them. He said it was Dr. Derr's farm. I don't know what the nature of an oath means. I don't know what this trial is for."

Dr. Ashinhurst testified:

"I have known Floy Parker about 10 years. I examined her the 3d day of this month, and found that she was 4 or 5 months advanced in pregnancy. Dr. Browning assisted me."

R. J. Parker testified:

"I am the father of Floy Parker. She never visited any one by herself except Mrs. Hyde. She seemed to have her mind fixed to visit Mrs. Hyde once each month, usually on Sunday. Frank Hyde brought her home on Sunday, the 3d day of April, about 5:30 p. m. No one was with them. I was in the yard, and my wife went out and assisted Floy out of the car."

Walter Beatty testified:

"I know the defendant, Frank Hyde, and Floy Parker. On Sunday evening, April 3d, I was coming from my father-in-law's, two miles south of town. My wife and Tom Beatty and his mother were in my car. Frank Hyde and Floy Parker passed us in a car going north. It was somewhere about 5 o'clock in the afternoon. Dr. Derr's pasture is about 3 miles south of Waurika."

Mrs. Laura Beatty testified:

"I lived across the street from the Parkers'. I was with my husband and son. We were coming from my father's about 5 o'clock Sunday, April 3d, and I saw Floy Parker with a man in a car that passed us, my husband remarked the man was Frank Hyde. The defendant sitting there is the man."

At the close of the evidence counsel for defendant demurred to the evidence on the ground that it is insufficient to

warrant a conviction, and moved the court to instruct the jury to return a verdict of acquittal, which the court refused to do.

Daisy Hyde testified:

"I was formerly the wife of Frank Hyde. We have been divorced. I now live with his parents. On the 3d day of April Floy Parker spent the day at our home. Between 4 and 5 o'clock I asked Frank if he would go with me to take this Parker girl home. Frank and the little Dishman girl got in the front seat, the Parker girl got in the back seat with me, and Frank drove to the Parker girl's home. I got out of the car with her, and went into the yard, but I did not see Mr. or Mrs. Parker. I left the Parker girl in the yard, and got in the car and we returned to our home."

John Dishman testified:

"The defendant married my sister. I live across the road from his father. On the 3d day of April, about 4 o'clock, I saw defendant working on his car in front of his father's house, and my little girl asked her mother for permission to go with her uncle and aunt. I did not see her around the house for the next 30 minutes."

Mrs. John Dishman testified:

"The defendant is my brother, on the 3d day of April, between 4 and 5 o'clock, my daughter, Iris, 8 years old, asked me to let her go with her uncle. About 30 minutes later defendant drove up to the house with Iris in the seat beside him."

Iris Dishman testified:

"I am 8 years old. On the 3d day of April I rode with my Uncle Frank and Aunt Daisy up to Mr. Parker's, when they were taking the Parker girl home, and it was close to 5 o'clock in the afternoon."

Loyd Warren testified:

"On Sunday, the 3d day of April, I was at Frank Hyde's place, and saw defendant and a little girl in the front seat and Mrs. Hyde and the other girl in the back seat. It was between 4 and 5 o'clock when they drove off."

R. G. Hyde testified:

"Frank Hyde is my son. On Sunday, the 3d day of April, I heard my son's wife ask him if he minded carrying Floy Parker home. About 10 minutes later his little niece, Iris, left the house with him."

The testimony of the defendant in his own behalf is as follows:

"I have lived in Waurika since 1903. My parents live here. I have known Floy Parker since 1916. I recall that on the 3d day of April, 1921, I was working on my car in front of my father's house. About 5 o'clock Mrs. Daisy Hyde, my former wife, came and asked me if I would take the Parker girl home. I told her if I would get my car fixed I would. It is just a block from my father's place to my former wife's home. I got the car fixed, and with the little girl, Iris, I drove to Daisy's home, and Daisy and the Parker girl came out and got in the car, and I drove to the Parker home. Daisy got out with the Parker girl, and in a short time came back and got in the car, and I drove to Daisy's home. I would say that it took 30 minutes to make the trip. I was never alone in a car with Floy Parker, and I was not south of town with her. I never had connection with her as she testified."

In rebuttal nine witnesses testified seeing Frank Hyde, defendant, and Floy Parker, the two alone in a car Sunday evening, April 3, 1921.

The testimony in the case is very voluminous, covering several hundred pages, but we deem the foregoing statement sufficient to present the questions raised.

Bridges & Vertrees and J. H. Harper, for plaintiff in error.

George F. Short, Atty. Gen., and N. W. Gore, Asst. Atty. Gen., for the State.

DOYLE, J. (after stating the facts as above). This appeal is from a judgment of conviction for rape in the first degree, punishment having been assessed at imprisonment in the penitentiary for the term of 15 years. The information charges that in Jefferson county, on or about the 3d day of April, 1921, Frank Hyde, "did then and there willfully, unlawfully, and feloniously have and accomplish an act of sexual intercourse with a female, to wit, Floy Parker, then and there not his wife, and then and there being incapable through unsoundness of mind of giving legal consent."

It is contended on the part of the defendant that, in any view which may reasonably be taken of the testimony of the prosecutrix, it was insufficient to warrant or sustain the verdict, for the reason that, if the prosecutrix was so weak-minded and mentally unsound as to render her incapable of giving legal consent to the act charged, she must have been, for the same reason, incapable of giving competent testimony concerning the commission of such act.

Rape is defined in our Penal Code as follows:

"Rape is an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, under either of the following circumstances:

\*        \*        \*        \*        \*        \*

"Third. Where she is incapable through lunacy or any other unsoundness of mind, whether temporary or permanent of giving legal consent."

Section 1834, Comp. Stats. 1921.

Our statute provides:

"The following persons shall be incompetent to testify: First. Persons who are of unsound mind at the time of their production for examination." Section 589, Comp. Stats. 1921.

At the trial the state produced as a witness the prosecutrix, Floy Parker, and after she was sworn counsel for defendant asked permission to inquire into her mental condition to determine whether or not she was a competent witness. The jury retired in charge of a bailiff. Counsel for defendant thereupon proceeded to examine the witness; then counsel for the state cross-examined her. Counsel for defendant then offered the testimony of two doctors, who testified that witness was of unsound mind. The court ruled that Floy Parker was a competent witness, and over defendant's objection her testimony was admitted. The statute does not undertake to prescribe or define the amount or degree of mental unsoundness that must exist in order to disqualify the witness. The question of competency is one of law, and must be determined by the court.

In Adams v. State, 5 Okla. Cr. 347, 114 Pac. 347, it is said:

"When a witness is objected to on the ground that he or she is incompetent by reason of want of intelligence, it is the province of the trial court to determine the witness' competency, and its decision will not be reviewed unless there is a clear abuse of discretion, or the court admits or rejects the witness upon an erroneous view of a legal principle."

In Walker v. State, 12 Okla. Cr. 179, 153 Pac. 209, it is said:

"Under the statute, when a witness is objected to, on the ground of incompetency by reason of nonage, or want of intelligence, it is the province of the trial court to determine the witness' competency, and its decision will not be review-

ed unless there is a clear abuse of discretion, or the court admits or rejects the witness upon an erroneous view of a legal principle. * * * In this case no question seems to have been made as to the witness' capacity to receive just impressions respecting the facts upon which she was to be examined. While she stated that she did not understand the nature of an oath, as possibly many an adult might do if required to define the nature of the crime of perjury, we are satisfied that she understood the difference between right and wrong and the danger of false swearing, and that she was of sufficient intelligence to appreciate the conditions in which she was placed. Courts of justice should regard substance, not words, and a child that has an adequate sense of the impropriety of falsehood does understand the nature of an oath in the proper sense of the term, even though she may not know the meaning of the word 'oath,' and may never have heard that word used.''

In the case of State v. Simes, 12 Idaho, 310, 85 Pac. 914, 9 Ann. Cas. 1216, the precise question was determined by the Supreme Court of Idaho. In the opinion it is said:

''Since no conviction can be had without the state establishing beyond a reasonable doubt that the female was of unsound mind at the time of the commission of the alleged offense, and every presumption must be resolved in favor of the accused until overcome by legal and competent evidence, it would seem to follow, as a logical conclusion, that the prosecutrix, when produced as a witness, should, in the eye of the law, stand on the same footing as any other witness, sharing the same credit for sanity and competency as is prima facie accredited to all persons. The defendant in such a case, if he is going to enter a plea of not guilty and stand a trial, must thereupon proceed upon the presumption which the law accredits him. He cannot go to trial on the plea that he is innocent, and, the moment the state produces a witness against him, interpose an objection based upon the theory that the state has already established by its pleading one of the material and essential facts against him. When a witness is produced it is a right and privilege accorded to the ad-

verse party to object to the examination of such witness upon the ground of incompetency to testify. The question of competency is clearly one of law and must be determined by the court. Section 7883, Rev. St. 1887; Wigmore on Ev. § 497; 2 Elliott on Ev. § 753; Underhill, Cr. Ev. § 203; Cannady v. Linch, supra; Holcomb v. Holcomb, 28 Conn. 177. There is no fixed or established rule for determining such question. It seems, however, to be the usual practice, and, we think, the proper and orderly way to proceed, for the court to examine the witness for the purpose of ascertaining his condition of mind and ability to truthfully and correctly narrate the facts concerning which he is called to testify; and, in the determination of this fact, it may often be found proper and necessary to call other witnesses to testify. After the court has determined that the witness offered is competent to testify, the question of his credibility immediately becomes a matter for the consideration and determination of the jury. The mental condition of a witness, as manifested by him on the witness stand, almost invariably influences the jury as to the weight they will give his testimony. The manner in which a witness tells his story, the advantages he appears to have had for gaining accurate information on the subject, the accuracy and retentiveness of his memory, his capacity for consecutive narration of acts and events, his apparent frankness and intelligence, and numerous other considerations, all go to make up the sum total of credibility that the jury will give to the evidence of any particular witness. It should be borne in mind, too, that the mental capacity of the female to give her consent to the act for which the defendant is prosecuted is a question of fact for the jury to determine along with all the other questions of fact submitted to them by the evidence. Counsel for appellant argues, however, that, if the prosecutrix was so weak-minded and mentally unsound as to render her incapable of giving an intelligent assent to the violation of her person, she must have been, for the same reason, incapable of giving competent testimony concerning the commission of that act. While there is apparent reason for such an assumption, and in many cases it would undoubtedly be true, we don't think

the position tenable as a rule, nor that the latter conclusion necessarily follows the existence of the former fact. It would seem that a female, although of mature years, and fully developed physically, might be so far insane and mentally deranged as not to realize or appreciate the impropriety or effect of the illicit act, and still might be capable of giving a substantially correct and truthful statement of the occurrence and conditions under which it took place. Incapacity to give intelligent and legal consent to an act does not necessarily imply incapacity to thereafter correctly narrate the facts constituting the commission of the act.''

After much investigation we have reached the conclusion that the rule supported by reason and the weight of authority is that incapacity to give legal consent to the commission of an act of carnal intercourse does not necessarily imply incapacity to thereafter correctly and truthfully narrate the facts constituting the commission of the act; and the fact that the state accuses the defendant of rape in having accomplished an act of sexual intercourse with a female not his wife, who was at the time of unsound mind and incapable of giving legal consent, does not per se establish the incompetency of such female to testify against the accused.

In this case the record discloses such facts as convince us that the prosecutrix was competent to testify. We accordingly hold that the court did not err in overruling the objections made to her competency, and that the court properly permitted her to testify. The credibility of the witness was properly left to the jury, and has been determined by them.

The weight of the evidence was a question for the jury under the instructions of the court, which gave the defendant the benefit of all reasonable doubt, and we are not prepared to say that the verdict is not supported by the evidence.

In conclusion we simply add that the most careful examination of this record has revealed nothing that gives us the right to say that the interests of justice require a new trial.

It follows that the judgment of the district court of Jefferson county must be affirmed; and it is so ordered.

MATSON, P. J., concurs.

BESSEY, J., absent, and not participating.