## L. E. CARMICHAEL v. STATE.

No. A-6418.   Opinion Filed June 30, 1929.
Rehearing Denied August 18, 1929.
(279 Pac. 515.)

See, also, 32 Okla. Cr. 429, 241 Pac. 1117.

White & Reid and Lunsford & Windham, for plaintiff in error.

Edwin Dabney, Atty. Gen., J. H. Lawson, Asst. Atty. Gen., and Jas. S. Babb, Co. Atty., for the State.

EDWARDS, J. The plaintiff in error, hereinafter called defendant, was convicted in the district court of Le Flore county of manslaughter in the first degree and was sentenced to a term of 15 years in the state penitentiary.

Prior to September 8, 1925, defendant and L. E. Thrasher, the deceased, were joint owners and officers of the local telephone company at the city of Poteau. They were brothers-in-law, having married sisters. Differences had arisen between them over the management of the company, and there was considerable ill feeling. Mamie

Fries was auditor and bookkeeper and performed some duties as office manager for the company. On the morning of the date charged, Thrasher and Mamie Fries opened the office. Thrasher seated himself at a desk sorting the long distance call tickets of the previous day, and Mamie Fries engaged in office work. In a short time defendant came into the office. There are two versions in sharp conflict as to what then took place. Mamie Fries testified: That when defendant came in Thrasher was seated at the desk at work, and the witness was just finishing some work on the typewriter. Defendant said: "Thrasher, can I see you a minute?" Deceased answered: "Yes." Defendant closed the front office door, which locked itself, then came around and closed the operators' restroom and locked it, put a stool by Thrasher, and told witness to take the stool, that he wanted to talk to them, and he then took the chair just left by witness, who seated herself on the stool by Thrasher. Defendant then said: "Thrasher, what are you going to do about the business?" Thrasher continued his work and said: "Nothing, Lewis; you started this thing. You wanted to do it, and I am leaving it up to you." Defendant further said: "Well; I am being mistreated." And Thrasher answered: "I don't think so. If any one has been mistreated, I am the one." Defendant then drew a revolver from under his coat, and witness ran across the room and began screaming and heard shots. When she reached the wall she discovered that she was wounded. That she was crouched or crumpled down on the floor and saw defendant about that time, who had stopped shooting, but had a gun in his hand. He broke it, put it back, laid it across his left hand, pointed it at her, and fired, and it seemed as if something had burst in her head. The next thing she knew the office was full of people. She was picked up,

put in a chair, taken to her home and later removed to a hospital. Defendant testified in substance: That there was unfriendly feeling between him and Thrasher. That Mamie Fries bore an enmity toward him because some two years before he had caught her in bed with Thrasher in Oklahoma City. That he was informed by Brehm, a minor employee, that Thrasher wanted to see him that morning. He went to the telephone office and asked Brehm to go with him. When they arrived there Thrasher was in the door, and he and defendant went into the office, and Thrasher told Brehm it was none of his affair, he need not come in. That Thrasher directed defendant to take the chair, and Thrasher closed the door and the door of the restroom, and the witness Mamie Fries seated herself on a stool near him. When seated Thrasher said, "Lewis, damn you, you have ruined Mamie and me." That the witness Mamie Fries then drew a gun and with both hands held it on him. He grabbed it, and Thrasher said: "Shoot him, Mamie, shoot him!" Defendant grabbed the gun barrel, and about the same time Thrasher also grabbed the gun, and Mamie Fries ran around, took him by the ear and around the neck, and defendant was trying to get his gun out of his shirt, and Thrasher fired and then fired again, and the gun fell from Thrasher's hand. That Mamie Fries ran around the corner, and he thought she was reaching for another gun, and he shot three times. He turned and Thrasher was standing by the desk reaching in the desk, and he fired again, and Thrasher fell back in the chair. He turned around again and Mamie Fries was reaching in a shelf. That he told her to leave the gun alone and shot again, then turned the gun down, put another shell in it, and shot her again. About that time some one knocked and ordered the door opened, and he answered and opened it.

Defendant and Mamie Fries were the only witnesses of what took place in the room. Almost by the time the shooting had ceased the sheriff, the chief of police, the mayor, and others were at the door of the telephone office. Justin Byers, chief of police, was in a car a half block from the scene and rushed at once to the office door of the telephone building. The shooting was over, and he shook the door and demanded admittance. Receiving no response he went around to the restroom, knocked and demanded admittance, but, receiving no response, returned to the office door, and defendant then opened it. He entered and took a pistol from defendant. Thrasher was dead at the time, leaned back in a spring-back chair as far as the chair would go, with his head over to one side, his left hand in his lap, with the telephone tickets between the thumb and forefinger, his face covered with blood, his glasses in place on his nose. A 38 Harrington-Richardson pistol lay on the floor at the left side, with two loaded shells and three empty shells, appearing to have been recently fired. There were powder specks on the right hand and two bullet wounds on the body of Thrasher, one entering at the second button from the bottom of his trousers in front ranging upward and lodging just below the right shoulder blade; the other entering under the chin on the left side and ranging upward and coming out near the center of the top of the head. Mamie Fries was lying on the floor in the north part of the room, suffering from various wounds. There was a shot wound through her right shoulder, two wounds on the left arm, one two inches below the elbow, and one across the top of the forearm. Another bullet wound penetrated the right thigh, seven inches above the knee from the outside, coming out five inches above the knee on the inside, shattering the thigh bone, a slight wound

on the inside of the left leg between the knee and ankle, and a bullet wound in the right temple passing downward and inward, coming out in the palate of the mouth.

There are many details in the evidence not here recited; some testimony of malice and threats; some testimony of contradictory statements made by the defendant and some of the witnesses. As a whole, however, the testimony is clean-cut, presenting two widely divergent theories, that of the state showing a murder deliberately planned and coldly executed, that of defendant showing his presence at the scene of the tragedy in response to a request from deceased and there attacked in a manner leading him to believe as a reasonable man he was in danger of losing his life or of suffering great bodily injury. It is not contended that the evidence is insufficient. The case was closely and carefully tried by counsel for the state, counsel for the defendant, and the trial judge. The jury evidently believed the testimony of the state's witnesses, but made some concessions to the testimony offered by defendant.

The first assignment of error argued is that the court admitted incompetent evidence prejudicial to defendant. This is directed to various items of testimony. Nannie Mae Jenkins testified, in substance, that some time prior to the homicide defendant tore from the wall of the telephone exchange at Wister, where this witness worked, a set of rules signed by Mamie Fries, and said that within 30 days Mamie Fries' name would not be signed to anything, that there would be a new manager and that when he was manager things would be run his way; that subsequent to the homicide he said to her that he would be a free man in a few days; that he had too much money to lose and would be back in the company. Defendant

upon cross-examination had been asked concerning these statements. Defendant asserts that this is impeachment upon a collateral matter; that it could be no more than an idle boast and likely inflamed the jury against him. Payne v. State, 10 Okla. Cr. 314, 136 Pac. 201. If this were offered as a matter of impeachment only it is inadmissible. The state, however, insists the evidence is not impeachment, but since the witness was an employee of the telephone company in which defendant was a part owner, this statement by him to her that he would soon be again in the company was a warning to her and is an attempt by him to intimidate and to prevent the testimony of the witness against him. Ryal v. State, 16 Okla. Cr. 266, 182 Pac. 253. Defendant had formerly held a place of authority over this witness as an employee of the telephone company. This evidence probably has a tendency to suggest to her that in case of unfavorable testimony on her part her position with the company might be jeopardized. Under this view it is admissible. This assignment is also directed at testimony that defendant at one time prior to the homicide went out and brought a traveling man into the office who had offended or insulted Mamie Fries and required him to apologize to her. This was offered by the state in rebuttal to refute the testimony of defendant that for some time prior to the homicide enmity had existed toward him by Mamie Fries due to the claimed incident between Thrasher and her at Oklahoma City. We think this item of evidence inadmissible, but we fail to see how it could have been prejudicial. Rather it would seem to indicate that defendant insisted that the employees of the telephone company should be treated with respect in the discharge of their duties and the incident placed him in a rather favorable light than otherwise.

It is also urged the testimony of Dr. Hardy and Dr. King, describing the wounds, the length of Mamie Fries' stay at the hospital, and the extent of her injuries, is incompetent and prejudicial. It is well settled that the res gestae of an offense is not inadmissible because it may show the commission of some other offense or contain prejudicial matter. It is true the guilt or innocence of the defendant does not depend upon the period of her stay in the hospital, nor pain and suffering sustained. It is the theory of the state, however, that defendant intended to kill both Thrasher and Mamie Fries, and all his acts in shooting Thrasher and the witness are admissible as showing intent and premeditation. The entire incident and all the circumstances, including the serious nature of the wounds of Mamie Fries, are admissible as throwing light on the transaction and as tending to show intent. Miller v. State, 13 Okla. Cr. 176, 163 Pac. 131, L. R. A. 1917D, 383.

A diagram of the interior of the telephone office where the homicide occurred was admitted in evidence. This shows the location of the furniture, with the measurements and the relation of the items to each other, and shows the location of various bullet marks as testified to with dotted lines showing the range of the bullets. These various matters were testified to by the civil engineer who drew the diagram. The different bullet marks and the lines showing the range of the bullets are numbered. Complaint is made that the numbers are inadmissible and prejudicial to defendant. At the time the plat was offered, objection was made to these numbers, and the county attorney at the time stated he did not insist on the figures and offered to strike them from consideration of the jury. After some colloquy the objection was overruled. A diagram or plat should be correct and faith-

fully represent the object portrayed. The numbering was for the benefit of the county attorney and is of no particular importance. Certainly it was not prejudicial.

The next assignment of error is that the court's instruction No. 11, under the facts, is prejudicial. It is admitted it is correct as a matter of abstract law. This instruction is:

"You are instructed that the defendant in this case, in support of his plea of not guilty, pleads as a justification of such homicide that while he killed the deceased, he acted in self-defense, and in this connection you are instructed that every person has a right to repel an attack or threatened attack on his person by the use of force, even to the extent of slaying his assailant, provided he does not use more force than is reasonably necessary to repel the attack or threatened attack; and if you believe from the evidence in this case, or entertain a reasonable doubt thereof, that the deceased in such manner as is calculated to excite the mind of the defendant, made an attack upon the defendant, and that such attack was in such a way that the defendant had reasonable grounds to apprehend a design upon the part of the deceased to take his life or to do him great bodily injury, and that it reasonably appeared to the defendant at the time that there was imminent danger of such design being carried out, then the defendant is not bound to retreat, but could stand his ground and repel the attack with such force as was necessary to protect himself from death or his person from serious bodily harm, even to the extent of killing his assailant, and if the killing occurred under such circumstances the defendant is not held criminally responsible if he acted in self-defense from real and honest conviction as to the character of the danger in which he was placed, although he may have been mistaken as to the extent of the actual danger."

Defendant asserts that part of the instruction limiting the right to justification as a defense permitted de-

fendant to defend only against an attack made by deceased, and does not permit him to defend from an attack made by the witness Mamie Fries at the instigation of and in connivance with deceased. Of course, if a person is attacked by two or more persons apparently acting together he may defend against either of them, and a person upon trial is entitled to have an instruction embodying his theory of the case, based upon his testimony upon the hypothesis that it is true. Defendant's testimony and theory was that he acted in self-defense of his person. The court instructed upon the law of self-defense, and if the instructions were not sufficiently full upon this point, or if counsel were of the opinion that an additional instruction should be given, it was their duty to reduce it to writing, submit it to the trial judge, and request that it be given the jury. If they failed to do this, the trial judge had a right to assume that the instruction upon the law of self-defense was sufficiently full. When a request is not made the conviction will not be reversed for failure to instruct more fully unless this court can say, in the light of the entire record and instructions, that by the failure of trial court to instruct the jury upon some material question of law the defendant has been deprived of a substantial right. Fitzsimmons v. State, 14 Okla. Cr. 80, 166 Pac. 453; Branham v. State, 16 Okla. Cr. 309, 182 Pac. 525; Merriott v. State, 18 Okla. Cr. 247, 194 Pac. 263. Requests for instructions were made by defendant's counsel, but none on the point here contended for.

Lastly, it is contended that there is misconduct of the county attorney in his closing argument in making inflammatory statements calculated to arouse the passion and prejudice of the jury. The entire closing argument is set out in the record. Several objections were made in

the record of the argument, and in an instance or two the county attorney upon objection being made withdrew his statement, and in some instances the court sustained the objection. Both the state and the defendant have the right of argument. This right contemplates a liberal freedom of speech. It is under the control of the court, and when the county attorney goes outside the record upon some material point, or obviously appeals to passion and prejudice, the court should interpose and require counsel for the state to conform to these settled rules and if need be strike out and withdraw any improper statement made and, if flagrant, reprimand counsel. In considering what is improper argument, it is not to be overlooked that the range of discussion, illustration, and argumentation is wide; that counsel have a right to fully discuss from their standpoint the evidence and the inferences and deductions arising from it. It is only when argument is grossly improper and unwarranted upon some material point which may have injuriously affected a defendant's rights that a reversal can be based on improper argument. We have examined this closing argument with care. It is a strong presentation of the state's case. We believe it is not unfair, and that in the instances where a statement made in the argument is withdrawn by the county attorney and the objection sustained by the trial court that such withdrawal and the ruling were extremely favorable to defendant.

Upon a consideration of the entire record, defendant was fairly tried, and no substantially prejudicial error is made to appear.

The case is affirmed.

DOYLE, P. J., and DAVENPORT, J., concur.