## ALBERT L. GREGG v. STATE.

No. A-9691.   March 14, 1940.
(101 P. 2d 289.)

Jerome Sullivan, of Duncan, Mark O'Quin, of Lakeland, Fla., and Earl Pruet, of Oklahoma City, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Jess L. Pullen, Asst. Atty. Gen., and J. W. Marshall, Co. Atty. of Stephens County, of Duncan, for defendant in error.

JONES, J. The defendant was charged in the district court of Stephens county with the offense of rape in the second degree, was tried, convicted and sentenced to serve a term of one year's imprisonment in the state penitentiary, and has appealed to this court.

The defendant has filed a voluminous brief, covering 150 pages and making 41 different assignments of error. The assignments may be grouped under the following headings:

1. The evidence is insufficient to support the conviction.

2. Error in the admission of evidence over the objection of the defendant.

3. Improper and prejudicial argument of the prosecuting attorneys.

4. Misconduct of the trial court.

5. Error in denying the defendant's request for a medical examination of the prosecutrix.

6. Error of the court in excusing certain jurors for cause.

7. Error in exclusion of evidence offered in support of the defendant's theory.

8. The failure of the court to give an instruction on alibi.

Before considering these various assignments, it is well to present a condensed summary of the evidence pre-

sented in this case. The prosecuting witness, Helen Magnusen, testified that she was 17 years of age; that her mother died in 1934; that her father lived in Sterling, Okla.; that after her mother's death, she lived with her grandparents in Marlow; that in 1935 she attended school in Siloam Springs, Ark., where she had taken a course in typing and shorthand; that in January of 1936 she lived with her uncle in Wewoka, where she went to school during the remainder of that school term; that she returned to Marlow in June of 1936, and at the request of her grandmother the defendant gave her some part-time work at typing; that she was working for experience, but that the defendant gave her some money from time to time; that shortly after she started to work for the defendant, she joined the Baptist Church, of which Gregg was the pastor; that the defendant first embraced her at the time she joined the church; that she went to school at Marlow during the year 1936 and 1937, working after school for the pastor at his study doing whatever secretarial work he needed to have done; that sometime after she had joined the church they became intimate; that she did not remember the exact date of the first time that he had kissed her, but that he kept kissing her and embracing her, and started exhibiting his sexual organs to her with the excuse that she should know about such things for her own protection; that he later told her about sexual intercourse and said he wanted her to know all about what it was; that the first act of sexual intercourse between them occurred in September, 1936, and that these acts of sexual intercourse continued on an average of once a week until she went to California on June 26, 1938; that these acts generally occurred in the pastor's study, and on one occasion he had sexual intercourse with her three times in one day; that there was a large unabridged dictionary on the typewriter

desk, upon which she sat with one foot on a straight legged chair and the other foot on a rocker; that he would stand in front of her and consummate the act in that position; that this position was taken at the request of the defendant for the reason that it would present a better appearance if someone should suddenly come to the pastor's study. That the defendant discussed the question of her menstrual periods with her, and on one occasion had her take a douche. That on June 24, 1938, when her grandparents had gone to see a doctor in Duncan, the defendant came to their house; that she did not know the exact time, but thought that it must have been between 11 a. m. and 1 p. m.; that they went into the back bedroom and accomplished another act of sexual intercourse on the bed; that the defendant remained at the house about 15 or 20 minutes; that she fixed the day by the fact that she left Marlow to go to California on Sunday, June 26, 1938, and that this act occurred on the preceding Friday; that she left Marlow because her grandparents were sending her, as she had graduated from the Marlow High School that spring. That she was born on March 29, 1921, and had never had any love affair or sexual intercourse with any other man than the defendant, and that no boy friend ever visited her. A poem, "The Voice of Love," was dictated to her by Gregg and is included in the record, a reading of which corroborates the statement of the prosecutrix as to defendant's attitude towards her. That she received from the defendant a large number of letters while she was in California, which letters were introduced in evidence. These letters show that the defendant wrote her almost daily, and sometimes twice a day, from the time the prosecutrix left Marlow until the defendant left Marlow for his summer vacation; that the defendant gave her two pictures of himself, and just before she left for Cali-

fornia he gave her $6 with the understanding that she was not to tell her grandmother about it; that they had an understanding as to how he was to send her money to use in returning to Marlow; that the defendant and his wife came to where she was living in California, but that her aunt refused to allow them to see her; that she discovered that she was pregnant after she went to California; that on August 11th she attempted to commit suicide by taking ant poison; that on August 29th she confessed to her aunt about her illicit relationship with the defendant, which was the first time that she had ever told anybody; that on August 31st, she had a miscarriage or abortion; that she wrote her father, and her father came to California and furnished the money to have her sent back to Marlow, where she filed the complaint against the defendant.

The prosecutrix related in detail about several occurrences and conversations had with the defendant concerning their promiscuous misconduct, the details of which would serve no useful purpose in this opinion and will not be set forth herein, other than to remark that they showed that the prosecutrix had become infatuated because of the attentions paid her by the defendant, and that the defendant likewise had more than a fatherly interest in the prosecutrix.

The girl's grandparents testified that she had worked for Gregg from June 23, 1936, to June 24, 1938; that there was an increasing familiarity between the prosecutrix and defendant during this period that was very noticeable and caused the grandparents to send the prosecutrix to California to get her away from the defendant; that the grandfather talked to the defendant in July of 1938, after he had learned that the defendant was going to Fresno, Cal., where the prosecutrix was living with her aunt, and requested Gregg not to bring the prosecutrix back to Mar-

low. They further testified that in all the time Helen lived in Marlow with them, she did not keep company nor show any interest in any man or boy other than the defendant.

Anne Olson testified that she is an aunt of the prosecutrix and was living in Fresno, Cal., on June 29, 1938, when Helen arrived; that Helen stayed with her until September 25, 1938; that about two weeks after Helen arrived at her place she confessed that she was in love with the defendant; that on July 19, 1938, Gregg and Mrs. Gregg came to see Helen, and she refused to allow them to talk to Helen and told the Greggs that Helen had confessed her deeds to her; that the defendant tried to talk with Helen and shake hands with her, but that she, Anne Olson, did not permit it. The witness corroborated the prosecutrix concerning the attempted suicide, the examination of the prosecutrix by a doctor after the abortion, and of her return with the prosecutrix to Oklahoma after the girl's father had come to California and arranged for the return of the prosecutrix to Marlow.

This witness was a Pentecostal preacher; and during her testimony some effort was made by the defense to show that she was prejudiced toward the defendant by reason of refusal to allow her to use the Baptist Tabernacle for a convention a few years before that time. She related about the large number of letters received by Helen from the defendant.

Dr. J. L. Patterson and Dr. D. T. McGregor each testified as to an examination made of this prosecutrix immediately after her return to Marlow; that their examination disclosed that she had had sexual intercourse and that there was a slight tear on the mouth of the womb, caused by a dilation, which in their opinion was caused

by pregnancy or miscarriage; that the girl was fully developed physically and had the appearance of being a much older girl than 17 or 18 years of age, and that from their examination she gave the appearance of a young married woman and indications were that she had had sexual intercourse several times.

The defendant introduced the testimony of several reputable citizens of Stephens county, who testified to the former good reputation of the defendant; and the state admitted that prior to the filing of the complaint against the defendant he had borne a good reputation in that community.

Several people testified that the prosecutrix had a bad reputation for truth and veracity; while just as many testified for the state in rebuttal that the reputation of the prosecutrix for truth and veracity was good. Other witnesses testified as to statements made by the prosecutrix before she went to California, indicating the grandparents of the prosecutrix had mistreated her.

The state, at the request of the defendant, elected to rely upon the specific act alleged to have been committed at the grandfather's house on June 24, 1938. To refute this evidence the defendant offered the testimony of several witnesses to trace his whereabouts during that day, which showed that he had been in the country eight miles from Marlow to make arrangements for a funeral, and had been to the hospital and in his study at the church. This testimony will be considered in disposing of the assignment of error relative to the alibi instruction requested by the defendant.

The defendant testified in his own behalf that he was 46 years of age, and that he had been pastor of the Baptist Church in Marlow for eight years. He specifically

denied ever having had any illicit relations with Helen Magnusen. His testimony showed that the pastor's study was the center of all activities concerning the church, and that this study is located just a short distance from the rear door of his residence. He details his whereabouts on June 24, 1938, in substance the same as the other witnesses. He admitted writing letters to the prosecutrix and going to California to see her; but denied that he had any improper motives in any of his conduct in that regard.

The defendant first contends that the evidence is insufficient to support the conviction. The testimony of the prosecutrix covers 125 pages in the record. To this court it bears the imprint of truth. She details the relationship with the defendant from the time he commenced drawing pictures of sex organs and lecturing to her about life until the last act was committed on June 24, 1938. After reading this record, it is hard to understand how any reasonable man could conclude otherwise than that this girl was telling the truth about her relations with the defendant. Two reputable doctors corroborated the fact that their examination indicated that sexual intercourse had been repeated many times. She did not date other boys and was never with any other man than the defendant.

The conduct of the defendant in writing letters to her daily indicates that his interest in this child was far deeper than just a fatherly interest, as the defendant would have the court believe. The girl testified that the word "dictation" was the word used between them to mean intercourse. In one of the letters written by the defendant to the prosecutrix while she was in California, we find a postscript in the handwriting of the defendant in which he states, "Oh, how I need you for my dictation," and underscored the word dictation. The defendant admits writing this postscript, but denies that it had any

improper meaning. The testimony of the grandparents and of the aunt corroborated several of the details testified to by the defendant.

In addition to the poem, "The Voice of Love," heretofore referred to, the defendant wrote another poem to the prosecutrix as follows:

"I want to write a poem—
That poem gives things at far,
However, I choose words not used every day—
Some are magnitude, colossal, chivalry, and home.
"Oh, I want to write a poem about someone
A word I would fix
And in that is the coloring, the tonic,
And thrill of moments.
"The poem that I would like to write
Has in it a message to you.
The things related just come
And some of them that should be magnified in this poem.
But a bad man should be about the grave just ahead.
We know not where the road around the grave may lead,
But the end, after all the turns,
The mountains and falls has been made,
Is where the spotlight shines.
"I want to write a poem about that one place
And tell you of the light, the labor and love.
It may be privilege so far as time be filled,
Love, repeatedly and greatly 'for you and me.'
                                    "Albert L. Gregg"

The defendant denied the sexual intercourse attributed to him by the prosecutrix; but the issue as to which of these parties the jury should believe has been submitted to them, and they have found against the defendant; and we think there is ample evidence in the record to support this finding.

The defendant next contends that the court erred in the admission of evidence over the objection of the defendant. This case was hard fought. The defendant was represented by able counsel who vigorously contested the state at every stage of the proceedings. The state was represented by the county attorney and by two able attorneys who had been employed as special prosecutors. It would have been rare indeed in a trial covering the period of time devoted to the trial of this case and one as hard fought as this case for no errors in the admission of evidence to have been made. We do not find any testimony admitted in this record which is of sufficient importance for this court to say that it prejudiced the jury. To the contrary, we find that the court was very lenient with the defendant in allowing them to place incompetent and immaterial testimony in the record. In the cross-examination of Judge Purcell, defense counsel were allowed to ask many questions which were wholly incompetent, going into the home life of Judge Purcell. The following are typical examples of questions submitted to this witness:

"Q. Have you and your wife ever been separated? * * * Q. I will ask you if you didn't quit going to the Christian Church in Marlow because one of your daughters got in a scrape with the pastor there and you got mad at him?"

The defense counsel contended and made offers of testimony in the presence of the jury, which were inadmissible and which clearly prejudiced the state's case, and if the record had disclosed that similar conduct had been indulged in by the prosecution, this court would not hesitate to reverse this cause.

Very little complaint can be made of the trial judge in his ruling on the admission of evidence. We find that his rulings on all questions of evidence where the matter

was of importance was in favor of the defendant. The county attorney at times asked leading questions, and objections to the form in which the questions were asked were sustained several times by the court. The county attorney should have refrained from this conduct, and should not have caused the defense to be forced to make objections in the presence of the jury to his method of conducting his examination; but we fail to see where this conduct under the record materially affected the defendant's rights.

Counsel next contends that the argument of the prosecution was prejudicial. Objection is made to the argument of the special prosecutor. All of the arguments of the attorneys are not in the record. There appear only certain extracts thereof contained in the argument of Special Prosecutor Singleton and County Attorney Marshall. In one instance Mr. Singleton referred to the defendant as a "leacher", and they object to his statement in the argument where he said: "I think the evidence in this case is far more conclusive than in cases where lives have been snuffed out in the electric chair at McAlester," for the reason that it was an expression of a personal opinion of the guilt of the defendant by the prosecutor.

We have laid down the rule in many cases that prosecutors in their arguments should not make statements not based upon the record and that they should not make references as to their personal opinion concerning the guilt of the accused. In this case, however, with what little excerpts from the argument of counsel as do appear in the record, the statement of counsel as to his opinion of the guilt of the defendant is a statement of the attorney, which he says is his conclusion from the evidence. We cannot say that his terming the defendant a "leacher" is an unwarranted inference from this record, with the guilt

of the defendant so clearly established. The assessment of the minimum punishment surely does not indicate that any remarks made by the two attorneys prejudiced the defendant's case. The highest possible tribute that could be paid to the zeal and ability of defendant's counsel is the fact that defendant escaped with a verdict of only one year's imprisonment in the state penitentiary.

In the case of Sweet v. State, 68 Okla. Cr. 44, 95 P. 2d 242, 243, we laid down the following rule:

"It is the duty of the county attorney in his opening statement and closing argument to the jury to confine himself to the facts as shown by the evidence. But they have the right to draw their deductions and conclusions, and unless the statements or arguments are such that deprive a defendant of his substantial rights, or are such that would arouse the passion and prejudice of the jury to the extent that they would be swayed from arriving at a just verdict, the judgment and sentence will not be set aside on appeal."

See, also, Brown v. State, 52 Okla. Cr. 307, 4 P. 2d 129; Carmichael v. State, 44 Okla. Cr. 160, 279 P. 515.

Likewise we find that there is no merit in the defendant's contention that the trial court was guilty of misconduct in the handling of this case nor in his refusal to allow the defendant to have a doctor examine the prosecutrix at the time of trial. As hereinbefore set out, the record shows that the trial court was very liberal in his rulings so far as the defendant is concerned. It would only unduly lengthen this opinion to detail the portions of the record set forth in the brief of the defendant which they contend constitute a comment by the trial judge upon the weight of the evidence. It is sufficient to say that we do not think that the statements of the court are susceptible of the interpretation placed upon them by counsel.

Two reputable physicians, whose qualifications were admitted by the defense, testified concerning the condition of the prosecutrix as revealed through examinations made by them. Those examinations were made by the physicians in September. In the latter part of December, at the time this case was called for trial, more than six months had elapsed since the last alleged act of sexual intercourse with the defendant had occurred.

The correct rule is set forth in the case of McGuff v. State, 88 Ala. 147, 7 So. 35, 16 Am. St. Rep. 25: If the practice of compelling the prosecutrix to submit to an examination of her person by medical experts on motion of the defendant made at the trial were adopted as a matter of right in all cases of prosecution for rape, the temptation to its abuse would be so great that it might be perverted into an engine of oppression to deter many modest and virtuous females from testifying in open court against the perpetration of one of the most barbarous and detestable of all crimes. We have repeatedly held that a conviction for rape may be sustained on the uncorroborated testimony of a prosecutrix, which excludes the idea of any necessity for corroboration by an examination of her person. The prosecutrix is no party to any civil suit, but has been summoned at the instance of the state to testify in a criminal prosecution against an alleged violator of the law. It may well be doubted, in cases of rape, and cognate offenses, whether the court has the power to make an order compelling the inspection of the private person of a prosecutrix, in the event of her refusal to submit to such examination. If such rights exist at all, we should hold it to be a matter of judicial discretion with the trial court to be exercised only in cases of extreme necessity and not subject to review on appeal to this court.

In one case, Walker v. State, 12 Okla. Cr. 179, 153 P. 209, the prosecutrix was a child seven years of age, and her story of the alleged attack was very unsatisfactory. No physical examination of her person was made; and we held in that case that under the peculiar circumstances of the case it was an abuse of discretion on the part of the trial court to refuse to order a physical examination of the child by a competent physician when demand therefor was made by the defendant. This case is cited and relied upon by the defendant Gregg to support his contention. The cases are not similar. The request by the defendant herein was addressed to the sound discretion of the trial court, and we find no abuse thereof in this instance.

The defendant next contends that the court erred in refusing to instruct on the defense of alibi. The prosecutrix testified that the act relied upon by the prosecution occurred on June 24, 1938, at her grandfather's house; that the defendant's home was in the next block north from her grandfather's home; that she does not know the exact time that the defendant was there, but it was while her grandparents were gone to see the doctor, and in her opinion it was somewhere between 11 and 1 o'clock. That the defendant remained there about 15 minutes.

The defendant introduced witnesses to trace his whereabouts on that date. Garland Smith, the undertaker, testified that he saw Gregg the first time about 9:30 a. m., at the pastor's study, and was with him for 10 or 15 minutes; that the witness drove out to the Fritts home about 11 o'clock, and stayed 15 or 20 minutes, and then drove back to town, and went to the pastor's study; found Gregg there and stayed with him about 15 minutes, completing the arrangements for the funeral.

Kerb Fritts testified that the defendant came to the Fritts home, about eight miles west of Marlow, sometime

in the morning; doesn't know exactly what time it was, but it was before dinner.

Alton Perry testified that he was at the Fritts home and saw the defendant there that morning; that he doesn't know the exact time, but thought it was around 11 o'clock.

Mrs. A. L. Gregg testified that the defendant finished his breakfast between 8 and 9 a. m., and then went over to his study; that later that morning he drove in his car to the Fritts home. She doesn't know the time when he left or when he returned, except that when he came back in the house he went to the bathroom and disinfected his hands, and went to his study. That she called him about 12 o'clock at his study to come to lunch, and that he was busy with Garland Smith and did not come to lunch until about 12:15 or 12:20. That after he finished his lunch, he went to the Talla Hospital; and then after visiting at the hospital, he went to the funeral, which lasted until about 4:30.

The defendant for himself testified to substantially the same facts as were related by the other witnesses.

An examination of the defense testimony shows that the defendant had left the Fritts home and probably arrived back in Marlow before Garland Smith, the undertaker, left to go to the Fritts home, as there is no testimony on the part of the defendant or of Smith that they passed each other on the road. Smith says that he was at the Fritts home about 11 o'clock and stayed 15 or 20 minutes before driving back to town. Under the defendant's own testimony, he was in the immediate vicinity all during that day; and the trial court committed no error in holding that in view of the nature of the testimony given by the defendant's witnesses, and the indefiniteness with

which they fixed the time, the evidence showed a 30 or 40 minute period in which the act could have been committed and that an instruction on alibi was not proper.

The question of alibi is only incidental to the defendant's theory; the prosecutrix related a whole series of acts covering a period of 18 months. The defense theory was that this story was a fabrication, false in its entirety and without any foundation. He and his witnesses offered testimony to support his theory; and the general instructions of the court thoroughly covered this phase of the case.

This court will not hold that the trial court should give an instruction upon a so-called "fifteen-minute alibi" where all of the defendant's testimony shows that he was in the immediate vicinity where the alleged offense occurred.

Alibi is a physical circumstance and derives its entire potency as a defense from the fact that it involves the physical impossibility of the guilt of the accused. Harris v. State, 120 Ga. 167, 47 S. E. 520.

In the case of Barbe v. Territory, 16 Okla. 562, 86 P. 61, our court laid down the following rule:

"To entitle the defense of alibi to consideration, the evidence must be such as to show that, at the very time of the commission of the crime charged, the accused was at another place so far away or under such circumstances that he could not, with ordinary exertion, have reached the place where the crime was committed so as to have participated in the commission thereof; and, in a criminal prosecution, unless the evidence fills this requirement of the law, no instruction on the subject of alibi is necessary to be given by the trial court."

In the case of People v. Charles, 9 Cal. App. 338, 99 P. 383, the court held that it was not error to refuse to

instruct on the defense of alibi, where the accused's proof did not show that he could not have been at the place of the offense at the time shown by the prosecution.

The defendant himself did not know the time that he was at the various places during the day the alleged offense occurred. All of the evidence showed that he was present in such close proximity to the place where the offense is alleged to have been committed that we think the court's ruling thereon was proper.

The defendant complains of the action of the court in excusing certain jurors for cause. The record discloses that after the state had used its five peremptory challenges, the juror H. Calloway was called into the box. After a lengthy voir dire examination, both by the state and the defendant, the court excused the juror for cause. The juror Brooks was then called into the jury box, and the court on its own motion excused the juror for the reason that he had served on the regular jury panel a month previous. The juror did not ask to be excused. That exhausted the regular jury panel and additional jurors were summoned by the sheriff pursuant to directions by the court. The defendant then demanded that he be allowed two additional peremptory challenges, which request was denied by the court. The defendant has made no showing that he was prejudiced in any way as a result of this action of the court; and we do not find that there was any error because of such action.

In Boutcher v. State, 4 Okla. Cr. 576, 111 P. 1006, we laid down the following rule:

"If, for any reason, the trial court is of the opinion, or even suspects, that any juror is not fair and impartial, it is the right and duty of such court to excuse such juror, either upon the challenge of one of the parties, or upon motion of the court, and such action will be upheld upon

appeal unless it clearly appears from the record the trial court had abused its discretion to the injury of the defendant." See, also, Smith v. State, 5 Okla. Cr. 282, 114 P. 350.

The defendant has no vested right to have any particular juror on the panel selected to serve in his case. His right is that of refusal rather than that of selection. It is the duty of the trial court to exercise supervision over the selection of a fair and impartial jury. A liberal latitude should be given the court in these matters, and his action thereon should not be disturbed unless the record is clear that the defendant was prejudiced thereby.

The defendant complains of the action of the court in excluding the testimony of the witness Finis Martin. He was the nightwatchman who, while going up an alley after dark, heard a voice which he was unable to identify coming from the southwest bedroom of Judge Purcell's home where the prosecutrix was staying at the time of the preliminary hearing, which voice said, "The whole mess is a frame-up. I can't go through with it." The room from which the voice came was darkened and no person was seen therein. Certainly, if the defense could have connected the prosecutrix or any of the state's witnesses with the making of this statement, it would have been admissible where a proper predicate was laid for the introduction thereof. In this instance the predicate was laid, but the evidence was insufficient to connect this statement with the prosecutrix; and the court did not err in sustaining an objection thereto.

The members of this court have given this case much study and attention. It appears that the defendant has many friends in the community where he resides, who believe in his innocence; and his attorneys have very eloquently pleaded his cause before this court.

This court knows none of the parties involved; but taking the record as a whole and viewing it impartially, it appears to us that the evidence is conclusive of the defendant's guilt. The defendant took advantage of his position as a minister of the Gospel; and through his lust for this young girl's body, he cast aside his duty to his family, his friends and his profession. Instead of using the pastor's study for the spiritual and moral uplift of his people, it has become merely another one of hell's recruiting stations where this young girl is given the wrong slant upon life and has come to believe that the things that she did were not wrong because they were being indulged in by the man whom she looked upon as a spiritual leader.

We have all been taught that a pure and virtuous woman is the masterpiece and climax of God's creation and should be regarded by all true men with a feeling of respect which borders upon reverence. The defendant has been tried before a jury of his fellow citizens in the community where he resides; and they have found that the defendant is guilty of destroying the virtue of this young girl. We find that no material error has been made, and the judgment is accordingly affirmed.

DOYLE, P. J., and BAREFOOT, J., concur.