James Wadell WASHINGTON, a/k/a
Ernest Eugene Harper, Appellant,

v.

The STATE of Oklahoma, Appellee.

No. F–76–279.

Court of Criminal Appeals of Oklahoma.

Aug. 15, 1977.

Richard A. Hoffman, Asst. Public Defender, Tulsa County, for appellant.

Larry Derryberry, Atty. Gen., Harold T. Garbin, Jr., Asst. Atty. Gen., for appellee.

## OPINION

BRETT, Judge:

Appellant, James Wadell Washington, also known as Ernest Eugene Harper, hereinafter referred to as defendant, was charged in the District Court, Tulsa County, Case No. CRF–75–2445, with Murder in the First Degree, in violation of 21 O.S.Supp. 1973, § 701.1(8). Upon trial by jury conviction was obtained which carried the mandatory death penalty. From said judgment and sentence a timely appeal has been perfected to this Court.

The evidence adduced at trial can be summarized as follows. On the morning of October 14, 1975, a Tulsa police officer arrived at 2001 N. Trenton in Tulsa, Oklahoma, to check on the well-being of a family. After repeated knocking, a three or four year old boy, Chad Chancy, son of Leceta Burks, appeared at an upstairs window. This young boy eventually opened the front door for the officer. In an upstairs bedroom two bodies were found, a young girl named Teraunce Pegues, and her mother, Leceta Burks. Both had been shot in the head several times at close range. A pathologist testified that in his opinion the victims had been killed close together in time, although he conceded that the state of medical arts was such that he could not state for a fact that they had been killed any closer than 10 hours apart. The apartment was fingerprinted and it was shown that defendant's fingerprints matched those taken at the scene. A receipt bearing defendant's name was found on a dresser. There was testimony indicating that defendant had been living with the victims. It was proven that while on a trip to Oklahoma City with Ms. Burks defendant had

occasion to show Ms. Burks' brother-in-law a pistol which he carried, and which defendant stated was a .32 caliber weapon. A .32 caliber pistol and several slugs recovered from the bodies were introduced into evidence along with testimony indicating that the pistol had fired those slugs to the exclusion of every other gun in the world. The gun had been recovered on the afternoon of the 14th of October by a police officer summoned to an apartment in the Vernon Manor complex. The resident of that apartment found the gun on her bed and called the police. There were no prints on the gun, but human blood was found on the tip of the barrel.

Defendant was arrested inside the apartment of a friend in the Vernon Manor complex. Testimony of this friend showed that defendant had come over at about 9:00 a. m., asked the friend to get some gin, stating that he could not because he was "hot." When arrested defendant was hiding in a closet. There was a conflict in the testimony as to whether defendant was told when arrested that the arrest was for murder, or whether defendant replied "yeah, murder," when asked if he knew why he was being arrested.

It was further shown that defendant was wearing pants, shirt and tennis shoes when arrested, and that they had blood stains on them. The blood on the pants was the same type as Teraunce Pegues, blood group B. Defendant was brought to the police station and given *Miranda* warnings. An officer stated to the defendant that he had forgotten to wash the blood off of his pants. Defendant replied, "yes, I guess I did." When asked why he had killed the two victims, defendant said that he did not know. Defendant further stated that he had consumed a fifth of gin after he had committed the act. Defendant was asked if he used a .38 pistol, and defendant replied, "no, a .32." Defendant was asked where the gun was and if it were in the defendant's car. Defendant said that he did not know, that he had drunk a fifth of gin afterwards. Defendant commented to the police if they had found the bottle, and an empty gin bottle was found at the scene.

The victim's car was located some distance from the crime scene, and it contained defendant's fingerprints. The victim Burks' purse was found on the porch of a home, being discovered by the homeowner who called the police. The police recognized the name on identification .in the purse and thereafter took the purse to officers at the crime scene.

At one point during the trial, an officer testified that after having a conversation with Chad Chancy, "I directed my investigation towards the suspect named James Wadell Washington." Defendant's objections to this statement were overruled.

■ In his first assignment of error, defendant asserts the unconstitutionality of 21 O.S.Supp.1973, § 701.1, and § 701.3, which defines murder in the first degree, and prescribes the mandatory death penalty. He urges further that the punishment provision (701.3) is not separable from the provision defining murder in the first degree, § 701.1, and that therefore sentence should be set in accordance with the general felony statute, 21 O.S.1971, § 9. However, in *Riggs v. Branch,* Okl.Cr. 554 P.2d 823 (1976), this Court decided the issues defendant now presents, holding that the penalty provisions (§ 701.3) was severable from the definitional provision (§ 701.1), and accordingly holding that the appropriate punishment for one convicted under 21 O.S.Supp. 1973, § 701.1, is life imprisonment.

■ In his second assignment of error defendant again presents a constitutional attack, this time upon the validity of ¶ 8 of 21 O.S.Supp.1973, § 701.1, which provides as follows:

"Homicide, when perpetrated without authority of law and with a premeditated design to effect the death of the person killed, or of any other human being, is murder in the first degree in the following cases:

* * * * * *

"8. When perpetrated against two or more persons arising out of the same transaction or occurrence or series of

events closely related in time and location;"

Defendant's contention is that language of paragraph 8 is unconstitutionally vague in that a person of reasonable intelligence would not be able to garner therefrom that particular conduct which was prohibited. More specifically, defendant asserts that the use of the terminology "arising out of the same transaction" is indefinite and vague.

In *Synnott v. State,* Okl.Cr., 515 P.2d 1154, 1157 (1973), a similar argument was advanced, and we stated:

".  .  . The concept that a facially vague statute is unconstitutional rests upon the constitutional foundation of procedural due process which requires in the interest of fundamental fairness adequate notice of what conduct is proscribed and adequate standards for the adjudication of the offense by judge and jury. If this statute is so obscure that men of common intelligence must necessarily guess at its meaning and differ as to its application, it is unconstitutional. See e. g. *Connally v. General Construction Company,* 269 U.S. 385, 391, 46 S.Ct. 126, 70 L.Ed. 322 (1926); *Baggett v. Bullitt,* 377 U.S. 360, 367–368, 84 S.Ct. 1316, 12 L.Ed.2d 377 (1964).

"On the other hand, only reasonable certainty is required, *Winters v. New York,* 333 U.S. 507, 68 S.Ct. 665, 92 L.Ed. 840 and it is elementary that the prohibited act may be characterized by a general term without definition if that term has a settled and commonly understood meaning which does not leave a person of ordinary intelligence in doubt. *This is true although there may be in the definition of the term an element of degree as to which reasonable men might differ."* (Emphasis added)

We are of the opinion that the phrase "arising out of the same transaction" when read in conjunction with the succeeding phrase "or occurrence or series of events closely related in time and location" is sufficiently definite to pass constitutional muster. Defendant's second assignment of error is therefore without merit.

■ In his third assignment of error defendant asserts it was error for the trial court to refuse to give a requested instruction on second degree murder. Defendant contends that the State failed to prove that the deaths of the deceased individuals occurred any closer than ten hours apart. He apparently bases this contention on the testimony of Dr. Beamer, who performed postmortem examinations on the decedents. Dr. Beamer stated that in his opinion the deaths occurred relatively close in time, although he conceded that the state of medical arts was such that there was no way of determining the exact time of death, and that it was possible that the victims could have died as much as ten hours apart. It is upon this testimony that defendant bases his claim for a second degree murder instruction.

■ We are of the opinion that it was not error to refuse to give the requested second degree murder instruction. It is true that in a murder case the court should instruct on all degrees of homicide which the evidence suggests. However, it is also true as a general proposition that the court should not instruct on a lesser included offense when there is no evidence in support of it. See, *Batie v. State,* Okl.Cr., 545 P.2d 797 (1976). We have also further indicated in several cases that lesser included offenses in a murder case should only be given where clearly appropriate. *Murray v. State,* Okl.Cr., 528 P.2d 739 (1974); *Williams v. State,* Okl.Cr., 542 P.2d 554 (1975).

In the present case, we are of the opinion that since both victims' remains were found in the same room, and both were shot with the same gun, coupled with Dr. Beamer's testimony that they had died close together in time, there was sufficient evidence from which a jury could conclude that they had been killed "in the same transaction." Merely because defendant was able to elicit testimony from the doctor on cross-examination that the victims could have died as much as ten hours apart does not for that reason alone justify a second degree murder instruction.

In his fourth assignment of error defendant states that the trial court erred by not granting a mistrial when the defendant was brought in front of the jury in pants with the words "Tulsa County Jail" printed on them. Apparently, sometime during voir dire defendant split the seat of his pants. He was taken to the jail, given a new pair with jail markings on them, and then he was brought back into the courtroom. At the conclusion of the voir dire defendant moved for a mistrial based on this. The trial court noted that the markings were very faint and almost impossible to see. Further, the court ordered that the defendant be given a different pair of pants, without markings, if he so desired. Defendant's motion for a mistrial was then overruled.

Defendant asserts in his brief that is clear from the record that he was required to wear jail clothing during his jury trial. However, as we view the record in this case it is not clear that defendant was required to wear jail clothing during jury trial. Out of the presence of the jury the court ordered that defendant be given clothes without jail markings, if he so desired. For all that appears in the record, this order was complied with, for the defense never again raised the issue. In any case since the jail markings on defendant's clothes were, in the trial judge's words "next to impossible to perceive" we are of the opinion that no substantial rights of defendant were infringed and any error was harmless. Title 20 O.S.1971, § 3001.

Defendant's fifth assignment of error is that the trial court erred in not declaring a mistrial when the judge discovered that his clerk was not sufficiently mixing the names of the prospective jurors after each prospective juror's name was called. Defense counsel brought this to the attention of the trial court, whereupon after inquiring of the court clerk it appeared that rather than shaking the box containing the jurors' names, as required by 22 O.S. 1971, § 595, the clerk was merely stirring them about. In *Sam v. State*, Okl.Cr., 510 P.2d 978, 982 (1973), we said, in dealing with a similar contention:

"In the instant case, the only deviation from the statute was that the ballots were stirred rather than 'shaken.' The end result is the same. The ballots were mixed before the names were drawn, thereby complying with the purpose of the statute. . . ."

Defendant's fifth assignment of error is without merit.

In his sixth assignment defendant alleges as error the trial court's excusing a prospective juror because of reservations concerning the death penalty. After several questions were propounded to prospective juror Kelly in this regard, in answer to which prospective juror Kelly indicated some qualms about assessing the death penalty, the following colloquy occurred:

"PROSPECTIVE JUROR KELLY: I don't think I would like to take part in sentencing a man to death.

"BY THE COURT: Do you think that would prevent you from returning a guilty verdict in the case if the evidence showed the commission of the allegations of the Information beyond a reasonable doubt? I think that's probably the key question that you need to answer.

"PROSPECTIVE JUROR KELLY: I think maybe it would."

After this last answer the court excused juror Kelly, and defendant objected thereto.

In *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court held that it was impermissible to put a defendant to death when the jury which imposed such sentence was chosen by excluding veniremen who voiced general objections to the death penalty, or expressed conscientious or religious scruples against its infliction. In a footnote the Court went on to say that only if the venireman were irrevocably committed against imposition of the death penalty should he be excluded.

In *Justus v. State*, Okl.Cr., 542 P.2d 598 (1975), this Court held that *Witherspoon* was not applicable in Oklahoma. This was so, the Court reasoned, because the Illinois murder statute involved in *Witherspoon*

permitted punishment in the alternative, that is life imprisonment or death, to be decided by the jury; whereas in Oklahoma, according to 21 O.S.Supp.1973, § 701.1 and § 701.3, upon conviction of murder in the first degree, the death penalty was mandatory. The Court further stated in the third paragraph that:

"No venireman with animosity concerning the death penalty should be excused upon that basis if able to set aside personal beliefs or attitudes and fulfill the oath to try the case impartially accordingly to the law and the evidence. However, if knowing the death penalty to be mandatory upon conviction, a venireman is uncertain whether he could stand indifferent between the defendant and the State in deliberating his verdict according to the law and the evidence, or if satisfied of the defendant's guilt beyond a reasonable doubt, he is unresolved as to whether he could then assess the death penalty, then a challenge for cause is appropriate to the extent that the venireman is equivocal and uncertain regarding his capacity to follow the law and honor the oath of a juror. A challenge for cause should be granted against such a venireman, for otherwise the administration of the oath would be frivolous and create chaos resulting in our system of jurisprudence being a mockery based upon the personal whims of individuals."

A more recent United States Supreme Court case dealing with this issue is *Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976). There, the Supreme Court held that the death penalty could not be imposed where one venireman had been struck because of general objections to the death penalty. At the time of Davis' conviction in the Georgia courts, Georgia law provided that punishment for murder was life imprisonment or death. 26 Ga.Statutes Ann., § 1101.

■ We are of the opinion that prospective juror Kelly's answer to the last question asked quoted above indicated that his opinions and beliefs regarding the death penalty were such that they would, or possibly could, prevent him from returning a guilty verdict even though satisfied that defendant was guilty beyond a reasonable doubt. This being so, then under the rule enunciated in *Justus v. State, supra,* it was not error to exclude him.

■ *Davis v. Georgia, supra,* does not mandate a different result. This is so because Georgia provided sentencing in the alternative, as did Illinois in *Witherspoon,* and also because the Supreme Court of the United States indicated in *Davis v. Georgia, supra,* that failure to comply with *Witherspoon* meant only that the sentence of death could not stand, and not that the conviction itself would have to be reversed. Thus, since we are modifying defendant's sentence to life imprisonment under *Riggs v. Branch, supra,* defendant's contentions that juror Kelly was improperly excused, are moot at best.

■ A caveat should be added, however. Oklahoma's new murder statute, 21 O.S. Supp.1976, §§ 701.7 and 701.10, provides for alternative punishments, life imprisonment or death, upon conviction of murder in the first degree. This being so, juries selected to try cases under 21 O.S.Supp.1976, § 701, must be selected in strict compliance with *Witherspoon.*

■ In assignment of error number 7, defendant argues that the trial court erred in excusing juror Jones merely because he was "tired." However, we need only note that the trial court asked defendant's counsel if he had any objections to excusing juror Jones and defense counsel replied that he had none. Defendant's seventh assignment of error is therefore without merit.

Defendant asserts in his eighth assignment of error that the trial court erred in excusing a regular juror and substituting an alternate after the swearing of the jury, but prior to the introduction of any evidence, when the regular juror indicated to the court that a close friend had died, and he had been asked to be a pallbearer at the funeral. Defendant relies on 22 O.S.1971, § 601a, which provides for the selection of alternate jurors and which further provides,

inter alia, that the alternate should be seated upon the death or illness of a regular juror. Defendant contends that the language of Section 601a is exclusive, and that it is error for the trial court to excuse a juror once the jury has been sworn for any other reason than those enumerated in the statute, to wit, sickness or death. Defendant further contends that it was error for the trial court to excuse the regular juror without the consent and stipulation of the defendant.

As to defendant's first proposition, that the language of Section 601a is exclusive, we are of the opinion that *People v. Howard*, 211 Cal. 322, 295 P. 333 (1930), is dispositive of this contention. Therein, the court was also dealing with a statute which provided for substitution of an alternate upon the death or sickness of a regular juror. The court stated:

"While the circumstances of this case are not such as to bring it within the purview of section 1089 of the Penal Code providing for alternate jurors, we think the procedure by which the alternate juror was substituted in the place and stead of the regular juror was, at most, but an irregularity which in no way substantially affected the defendant's rights. In the execution of the means which the lawmakers provide to enforce the guaranties of the organic law, the end to be effected must be through the adoption of a reasonable and practical method to secure attainable ends. When this has been done, nothing more can be demanded, from the very nature of things. It is not claimed that the verdict would have been any different had the alternate juror not participated in the deliberations of the jury. He was subject to the same challenge and took the same oath as the other jurors. We should assume that in all respects he obeyed his oath and that he well and truly tried all the matters in issue and rendered a true and impartial verdict in the cause. Defendant's right was to a fair and impartial jury, not to a jury composed of any particular individuals. . . ."

Defendant's second proposition, that the trial court erred in excusing the regular juror without the consent of defense counsel, is likewise without merit. The trial judge has inherent power to substitute jurors for good cause. In *Gregg v. State*, 67 Okl.Cr. 103, 101 P.2d 289 (1940), which case was decided one year prior to the enactment of 22 O.S., § 601a, in Syllabus number six, this Court stated:

"It is the right and duty of the trial court to excuse any juror upon the challenge of one of the parties or upon his own motion at any time, if he believes it necessary to secure a fair and impartial jury."

In the present case, if juror Turner were not allowed to attend the funeral, it is entirely possible that he would have harbored ill will and prejudice toward the defendant and the court. It is also entirely possible and likely that the death of a close friend would have upset his emotions to the point where he could not have devoted his full attentions to the cause, thus denying defendant a fair trial. This being so, it was not improper for the court to excuse him on its own motion, and to substitute an alternate juror.

In his ninth assignment of error defendant argues that it was error for the trial court to permit introduction of certain testimony relating to inculpatory statements made by the defendant in the presence of Tulsa police officers. This is so defendant contends because the officers who testified as to these statements were not the officers who administered the *Miranda* rights notification to defendant, and defendant was therefore denied the right to cross-examine those who actually administered the rights warning.

This contention is without merit. In *Wadley v. State*, Okl.Cr., 553 P.2d 520, 524 (1976), we defined hearsay evidence as ". . . evidence of an out-of-court declarant which is offered to prove the truth of the matter asserted in the declaration."

In the present case, the "declaration" of the out-of-court declarant is the *Miranda* warning. However, it must be

noted that this "declaration" was not being offered to prove the truth of the matter asserted therein; that is, it was not being offered to prove that a suspect has the right to remain silent, the right to counsel, etc.; but rather, it was being offered merely to show that the statement was made, and not to prove it was truth. The statement not being hearsay, it was not error to admit it. See also, 23 C.J.S. Criminal Law § 836.

Defendant protests in his tenth and final assignment of error, prejudicial tactics on the part of the prosecutor. Although several propositions are urged, we deem it necessary to discuss only one, concerning the elicitation of certain testimony from Officer Jack Powell by District Attorney Fallis. This testimony is reflected in the transcript as follows:

"[BY MR. FALLIS:] Have you ever met a person by the name of Chad Chancy?

"A. Yes, sir, I have.

"Q. When and where did you first meet such a person?

"A. As I arrived at the scene at 2001 North Trenton on October 14.

"Q. Could you describe Chad Chancy for these folks?

"A. Yes, sir.

"MR. CORLEY: I'll object as being incompetent, irrelevant and immaterial to this charge at hand, Your Honor.

"BY THE COURT: I'll overrule it.

"A. Yes, sir. He is a small black male about three or four years old. He was dressed in a light colored T-shirt and some type pants, training pants or something of that nature.

"Q. I see. Where was he with reference to the address of 2001?

"A. Standing outside the front door with Sgt. Williams. He had just approached and was talking with him along with another lady who lives just next door.

"Q. I see, sir. Now, Mr. Powell, did you ever, on that date, have any conversation with this Chad Chancy?

"A. Yes, sir, I did.

"Q. Where did the conversation take place?

"A. Outside in front of 2001.

"Q. I see. Did you ask him any questions?

"A. Yes, sir, I did.

"Q. Did you do anything or did you receive any response to the questions?

"A. Yes, sir, I did.

"Q. And, did you do anything after you had received a response?

"A. Yes, sir, I did.

"Q. What did you do?

"A. I directed my investigation towards the suspect named James Wadell Washington.

"MR. CORLEY: I'll object to that and ask to approach the bench.

"WHEREUPON:

"(The following record was made at the bench out of the hearing of the jury, to-wit:)

"MR. CORLEY: Comes now the defendant and moves for a mistrial based upon the fact that the State directly elicited the testimony of the boy. They did not indirectly by asking the officer; what did you do? And he answered; I talked to the boy. As a result of that conversation, what did you do? I directed the conversation or the investigation toward this suspect telling them what the little boy had told them. I ask at this time for a hearing also out of the presence of the jury."

The hearing requested by defendant's counsel was for the purpose of inquiring into the legality of defendant's arrest, which motion was entirely separate and distinct from defendant's objections to the above quoted testimony. However, at the hearing Powell testified that Chad Chancy, son of Leceta Burks and brother of Teraunce Pegues, told him that the defendant had "hurt" his sister and mother after making a "big noise."

Defendant's objection is, of course, that the State did indirectly what they could not do directly; that is, the State elicited hearsay testimony which pointed the finger of

accusation directly at the defendant. We are of the opinion this was error, although several cases are urged as directing a contrary result.

*Walker v. State*, 89 Okl.Cr. 19, 204 P.2d 552 (1949), is not in point. There, defendant and another were being prosecuted for the larceny of an automobile stolen from Oklahoma City. A sheriff was permitted to testify that a woman told him of seeing two persons breaking into a filling station and fleeing. The sheriff apprehended defendant and co-defendant and brought them back to the filling station, where the woman identified them. The car which was the subject of the charge was discovered near the garage. A radio check revealed it to be stolen. At trial the State introduced testimony of the owner, however, they relied upon the testimony of the co-defendant to prove that defendant stole the car. Thus, the sheriff was permitted to testify not to information he received from a third party which implicated defendant in the crime charged, but rather to information he received from a third party which showed only why, how and where defendant was arrested. This was relevant because it showed that the defendant was arrested in close proximity to a car which was shown to have been stolen, and for the theft of which defendant was charged.

Similarly, in *Sang v. State*, Okl.Cr., 461 P.2d 976, 978 (1969), we stated:

".  .  . We are of the opinion, and therefore hold, that in order to show the validity of an arrest, it is competent to admit testimony of an officer that he had received a report of the commission of a felony and the description of the automobile and its occupants allegedly involved in the same. We wish to reiterate, however, that details of the alleged felony, or felonies, are inadmissible and the trial court properly excluded evidence relating to said details."

*Sang v. State, supra,* dealt with resisting arrest. The officers had received a report by radio of the commission of a felony by occupants of a particularly described car. Defendant was stopped and arrested for transporting an open container of alcohol. He resisted arrest, for which he was charged.

In *Carroll v. State*, 55 Okl.Cr. 197, 28 P.2d 588 (1933), a Texas sheriff was permitted to testify that he received information from an Oklahoma sheriff that a car of a particular description had been stolen by two persons who were also described as to appearance, but not identified by name. This Court held that testimony admissible, stating:

"This evidence was admissible to show [the Texas sheriff] had reasonable ground to suspect this defendant had committed a felony and was in the act of escaping therefrom. The only description of defendant testified to by [the Texas sheriff] was one given him as a foundation for defendant's arrest. This did not purport to be a description of defendant given by anybody identifying him with the taking of Dr. Watson's Ford coupe, but only information received from the sheriff of Waurika, Okl., that a felony had been committed and that two men of certain descriptions were suspected of having committed this felony and to arrest them if found.

"The cases relied upon and cited by counsel for plaintiff in error in support of this assignment of error are not in point, because in each of these cases there was an extrajudicial identification of the accused testified to on hearsay, and in addition the arresting officer was permitted to testify that he based his arrest on this extrajudicial identification."

In the third paragraph of the Syllabus to *Cothrum v. State*, Okl.Cr., 379 P.2d 860 (1963), this Court stated:

"In the trial of an accused for robbery, where the issue is whether the defendant is the person who robbed the prosecuting witness, testimony of what the prosecuting witness said in identifying or describing the robber at some other time or place is not admissible as original testimony. *In like manner, the testimony of the officer that from such description he arrested the defendant is hearsay and inadmissible.*" (Emphasis added)

The reasoning in *Cothrum* was subsequently modified such that an eye witness to a crime is now permitted to testify in court that at some time prior to trial he made an extrajudicial identification of defendant. *Hill v. State*, Okl.Cr., 500 P.2d 1075 (1972); *Towning v. State*, Okl.Cr., 521 P.2d 415 (1974). However, it was reiterated in *Hill v. State, supra,* and *Towning v. State, supra,* that although an eye witness can testify at trial to an extrajudicial identification, this can only be done by an eye witness, and cannot be done by an officer or any other third party who was present at the time the extrajudicial identification was made. Further, it is to be noted that the phrase "extrajudicial identification" means not merely a description of the suspect, but rather means the identification of a particular individual as the perpetrator of the crime.

The recitation of the preceding cases makes it apparent that it is permissible for an officer to testify that he received information from a third party which led to defendant's arrest provided, however, that the information received shows that the arrest was for a crime other than the one charged, or provided that the information received from the third party was just a description of the criminal and not an extrajudicial identification of the defendant as the perpetrator of the crime charged.

In the present case it is obvious that had the officer testified directly as to what Chad Chancy told him it would have been inadmissible hearsay, for as the testimony given during the hearing on defendant's motion to quash the arrest indicates, Chad Chancy told the officer that defendant had perpetrated the crime. Further, there can be no doubt that the jury was made aware of what Chad Chancy told the officer, because of the manner in which the testimony was elicited. As the above cited cases indicate, testimony of an officer that he arrested the defendant because of a third party's extrajudicial identification of defendant is error. However, we are convinced that though this was error and the jury should have been admonished to disregard it, an inordinate amount of prejudice did not flow therefrom. Even if this evidence were to be properly excluded there was more than enough evidence to justify defendant's conviction and it will not, therefore, be reversed on this account.

We have carefully examined defendant's other propositions under his tenth assignment of error and find them to be without substance. Defendant's final assignment of error is therefore without merit.

For the foregoing reasons the sentence is MODIFIED to Life imprisonment, and as modified the judgment and sentence is *AFFIRMED*.

BUSSEY, P. J., concurs.